UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
FURR'S SUPERMARKETS, INC.,
    Debtor.                                    No. 7-01-10779 SA

YVETTE J. GONZALES, TRUSTEE,
    Plaintiff,
v.                                                 Adv. No. 03-1072 S

SUN LIFE INSURANCE COMPANY,
    Defendant.

**MEMORANDUM OPINION ON: DEFENDANT SUN LIFE INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT (doc 50);
PLAINTIFF'S MOTION TO STRIKE AFFIDAVIT OF GENE DENISON
(doc 71); and PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (doc 121)**

    This matter is before the Court on the Motion for Summary

Judgment filed by Defendant Sun Life Insurance Company ("Sun

Life" or "Defendant")(doc 50) with supporting Memorandum (doc 52)

and numerous exhibits, Plaintiff's Response and Memorandum in

Support (doc 70), and Defendant's Amended Statement of Material

Facts in Support of Motion for Summary Judgment (doc 92),

Plaintiff's Response to the Amended Statement of Material Facts

(doc 97), and Defendant's Reply Brief (doc 101). Also before the

Court are Plaintiff's Motion to Strike Affidavit of Gene Denison

(doc 71) and Defendant's Response (doc 93)[1]. And, finally,

_____

    [1]Two other motions to strike were filed, but the parties
have suggested that those are now moot based on later
developments in the case. See Doc 128. Therefore, the Court
will not consider either 1) Defendant's Motion to Strike Portions
of the Affidavits of Michael J. Caplan and portions of Trustee's
Responses to Defendant's First Interrogatories to Trustee (doc
100) and Plaintiff's Response thereto (doc 107); or 2)
Plaintiff's Motion to Strike Affidavit of David L. Neale (doc
105) and Defendant's Response (doc 113).

before the Court are Plaintiff's Motion for Summary Judgment (doc 121) with Brief in Support (doc 122), and Supporting Third Affidavit of Rachel Kefauver (doc 124), Defendant's Response to the Motion (doc 125) and Plaintiff's Reply (doc 126). This is a core proceeding to recover preferential transfers. 28 U.S.C. § 157(b)(2)(F)[2].

Plaintiff filed this adversary proceeding on January 30, 2003 (doc 1), an amended complaint on February 7, 2003 (doc 3), and a second amended complaint (hereafter "Complaint") on May 12, 2004 (doc 15). Defendant filed an answer to the Complaint on February 10, 2005 (doc 21), an amended answer on March 16, 2005, and a second amended answer (hereafter, "Answer") on July 28, 2005 (doc 42). Defendant also filed a "Waiver of Ordinary Course of Business Defense" on June 29, 2005 (doc 38). Later, Defendant conceded its Priority Claim Affirmative Defense included in its Second Amended Answer to Second Amended Complaint, doc 42, p. 4, ¶ I. See Doc 125, p. 3.

Plaintiff's complaint is a straightforward preference complaint under 11 U.S.C. § 547(b)[3]. Defendant's Answer admits

---

[2]This case predates the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, so the amendments in that act are not applicable to this case.

[3]The 2001 version of section 547 states, in part:
Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property–

(continued...)

all allegations except three: 1) it denies that Plaintiff's
Exhibit A to the Complaint, which lists 16 payments, is correct
and affirmatively states that it received only 3 separate checks;
2) it denies that the payments enabled it to receive more than it
would have received had the bankruptcy case at all times been a
case under chapter 7 of the Bankruptcy Code, the payments had not
been made, and the Defendant had received payment of its
antecedent debt to the extent provided under the bankruptcy code;
and 3) it denies that Plaintiff has the right to a judgment.  The
Answer also contains 11 affirmative defenses: A) the payments
received were authorized by the February 8, 2001 "Employee
Benefits Order" (main case, doc 28); B) the payments were
authorized by estoppel and the "necessity of payment rule"; C) if
Defendant had not received the 3 payments during the preference
period, it would have received payment postpetition pursuant to

---

[3](...continued)
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the
debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made--
(A) on or within 90 days before the date of the filing
of the petition; or
(B) between ninety days and one year before the date of
the filing of the petition, if such creditor at the
time of such transfer was an insider; and
(5) that enables such creditor to receive more than
such creditor would receive if--
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the
extent provided by the provisions of this title.

the Employee Benefits Order, D) the payments were made from moneys held in trust by Furr's and did not belong to Furr's, E) a portion of the payments were "withheld" from employee's paychecks and did not constitute Furr's property, F) Plaintiff should be estopped by the "Employee Benefits Motion" (main case, doc 12, ¶¶ 7, 25 and 26) from arguing that the withheld amounts constituted property in which the Debtor had an interest, G) subsequent new value in the form of continuing insurance coverage, H) new value (contemporaneous exchange) in the form of continued services of the Furr's employees themselves, I) Sun Life would have received these payments as Section 507(a)(4) priority claims anyway, therefore would not have received less in a hypothetical chapter 7 case,[4] J) the Plaintiff should be estopped by the Employee Benefits Motion (main case, doc 12, ¶ 36) from arguing that the payments enabled Defendant to receive more than it would have received in a chapter 7 case, and K) ordinary course of business.[5]

First, the Court will decide the motion to strike.

**MOTIONS TO STRIKE PORTION OF DENISON AFFIDAVIT**

---

[4]Affirmative defense I was later withdrawn.  Doc 125, p. 4.

[5]Affirmative defense K was later withdrawn.  Doc 38.

Summary judgment is governed by Bankruptcy Rule 7056, which incorporates Fed.R.Civ.P. 56.[6]  Rule 56(e)(2001) stated as follows:

> **Form of Affidavits; Further Testimony; Defense Required.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Thus, there are three requirements for an affidavit submitted in conjunction with a motion for summary judgment: 1) it shall be based on personal knowledge, 2) it shall set forth facts that would be admissible in evidence, and 3) it shall show affirmatively that the affiant is competent to testify to the stated facts.  <u>Giles v. University of Toledo</u>, 241 F.R.D. 466, 469 (N.D. Ohio 2007).  An affidavit that fails to satisfy these three

---

[6] All references to F.R.Civ.P. 56 and F.R.B.P. 7056 are to the rules as they were worded from 1987 to 2007.  Defendant's Motion for Summary Judgment was filed on December 27, 2005.  Rule 56 was amended in both 2007 and 2010.  Those changes are not reflected in this decision.  The Court found it most reasonable to use the rules as they existed when the contested matter began.

Page  -5-

requirements is subject to a motion to strike and will not be
considered by the Court.  Id.  "The United States Court of
Appeals for the Tenth Circuit has explicitly held that legally
insufficient affidavits under Rule 56(e) are subject to a motion
to strike."  Servants of the Paraclete, Inc. v. Great American
Ins. Co., 866 F.Supp. 1560, 1564 (D. N.M. 1994) (citing Noblett
v. General Elec. Credit Corp., 400 F.2d 442, 445 (10th Cir.)),
cert. denied, 393 U.S. 935 (1968).)  "Furthermore, the United
States Court of Appeals for the Tenth Circuit has held that
'conclusory' summary judgment affidavits are legally
insufficient."  Id.  An affidavit is conclusory when it draws
inferences.  Id. at 1565.  Similarly, affidavits that contain
inadmissible hearsay are legally insufficient.  White v. Wells
Fargo Guard Services, 908 F.Supp. 1570, 1578 (M.D. Ala. 1995);
Giles, 241 F.R.D. at 471; compare Servants of the Paraclete, 866
F.Supp. at 1567 (out-of-court statements offered in affidavit
were not hearsay because they were not offered for their truth;
the affidavit was admissible.)  Any defects in an affidavit are
waived if not challenged.  Meinhardt v. Unisys Corp. (In re
Unisys Savings Plan Litigation), 74 F.3d 420, 437 n. 12 (3rd
Cir.), cert. denied, 519 U.S. 810 (1996).  And, if a statement is
successfully challenged, the Court does not strike the entire
affidavit; it disregards only the offending statement.  Perez v.
Volvo Car Corp., 247 F.3d 303, 315 (1st Cir. 2001)("The rule

requires a scalpel, not a butcher knife.")  Finally, it is proper
for the Court to consider a later deposition of the affiant to
determine whether the affidavit contains impermissible material.
Flair Broadcasting Corp. v. Powers, 733 F.Supp. 179, 182-83 (S.D.
N.Y. 1990).

The Denison affidavit (doc 43) is the source of many of the
facts in Defendant's Motion for Summary Judgment's Statement of
Undisputed Facts.  Plaintiff seeks to strike portions of it
because it is not based on personal knowledge, does not set forth
facts that would be admissible in evidence, and contains both
legal conclusions and hearsay.  Doc 71.  Defendant replies (doc
93) that Plaintiff's motion to strike is moot because Defendant
filed an Amended Statement of Material Facts in Support of
Defendant's Motion for Summary Judgment (doc 92) that added
additional citations to the record other than just Denison's
statements.  The Court disagrees that the motion to strike is
moot; if the affidavit contains inadmissible statements, the
filing of other and additional references to the record does not
make the statements in the first affidavit admissible and the
Court would prefer a clear factual record.  Defendant also
replies that, since filing the affidavit, Plaintiff deposed
Denison on substantially all of the statements and asks the Court
to consider the deposition testimony before striking anything.

Page -7-

Finally, Defendant denies that any of the affidavit is not based on personal knowledge or is based on hearsay.

The Court has reviewed the affidavit, the objection and response, portions of the deposition testimony, and exhibits submitted therewith, and finds that portions of the affidavit should be stricken. Paragraphs 1 through 6 are admissible. Plaintiff seeks to strike the last sentence of paragraph 7, based on Denison Deposition, doc 71, Exh. A, Pt. 1, p. 89, ln. 6-20 (he had no knowledge if withheld amounts were actually segregated); p. 93, ln. 19-23 (same); p. 96, ln. 6-13 (he did not know if funds could be traced); p. 97, ln. 1-15 (funds were possibly commingled, he just did not know). The Court agrees. Therefore, the last sentence of paragraph 7 is stricken.

Plaintiff moves to strike paragraph 8 because Denison is expressing the intent of Debtor when it purchased the insurance, claiming that he could not possibly know Debtor's intent. The Court disagrees, and finds that based on his high position in the company and his longevity and various duties over the years, he can express an opinion on corporate intent, especially if he was familiar with the particular transaction involved. See Ondis v. Barrows, 538 F.2d 904, 908 (1st Cir. 1976)(Court found it credible that an office manager would be someone in a position to have personal knowledge of business matters.) Therefore, paragraph 8 stands.

Plaintiff moves to strike entire paragraph 9 because Denison later testified that he was not very familiar with ERISA law and relied on attorneys to tell him things.  See Denison Deposition, doc 71, Exh. A, Pt. 1, p. 9, ln. 2-6, 15, 20.  The Court finds that this paragraph is based on hearsay statements of attorneys and will be stricken.

Paragraph 10 is admissible, but only up to and including the phrase "made by the Debtor to Sun Life."  Denison's deposition, Id. at p. 88, ln. 9-25; p. 89, ln. 1-20; p. 92, ln. 14-18; p. 93, ln. 19-23; p. 96, ln. 6-13; and p. 97, ln. 1-15, shows that he had no personal first-hand knowledge of what became of amounts withheld from wages.  Therefore the second half of paragraph 10, starting with "as well as the amounts" is stricken.

Similarly, paragraph 11 is admissible except for the sentence that starts "Also, the Debtor exercised said authority", which will be stricken for the same reason as stated for paragraph 10.

Plaintiff seeks also to strike the second sentence of paragraph 12 dealing with employee withholdings; the Court finds however, that Denison was in a position to know that there were employee withholdings and will not strike this sentence.  In other words, the Court sees a difference between the general fact that employees had insurance withheld from their paychecks and

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 9 of 138

the rather specific facts concerning tracing (if possible) the funds (if any) from withholding through payment.

Paragraphs 13 through 15 are admissible. Plaintiff seeks to strike paragraph 16, but the Court finds it credible that Denison, in his various positions with the Debtor, likely had personal knowledge of the facts stated in paragraph 16. Therefore, paragraph 16 will not be stricken. Paragraphs 17 and 18 are admissible.

The Court finds that entire paragraphs 19, 20 and 21 should be stricken as statements not made on personal knowledge, or, alternatively, statements made without establishing the requisite foundation. Paragraph 19 is clearly hearsay: how could Denison know that "Sun Life received three separate checks..." unless someone told him that. Paragraphs 20 and 21 either are hearsay, or statements made beyond Denison's capacity to testify from personal knowledge and will be stricken. The Court notes, however, that the numbers in the affidavit agree with the numbers on the checks.

Paragraph 22 is admissible. Paragraph 23 will be stricken. Denison admitted he had not seen the Employee Benefits Motion until after he executed the affidavit. Furthermore, the Employee Benefits Motion speaks for itself and is part of the record. Similarly, paragraph 24 will be stricken. Denison admitted he had not seen the Employee Benefits Order until after he did the

affidavit.  Furthermore, the Employee Benefits Order speaks for itself and is part of the record.

Paragraph 25 will be stricken.  First, it is conclusory.  Second, it draws legal conclusions which are the province of the Court.  Third, nowhere does the Employee Benefits Order "retroactively" authorize anything, so the content of paragraph 25 is factually incorrect on its face.  Finally, the intent of the Employee Benefits Order is obvious.

Paragraph 26 will be stricken as pure speculation.  Paragraph 27 likewise is pure speculation and without foundation ("[A]s a result of the continuing benefits ... the Debtor received the continuing services of said employees.") and will be stricken.  Also, the affidavit does not establish a foundation for which Denison could testify to the "value" of the services provided.  Paragraph 28 also discusses the value of the insurance, without providing a basis for the testimony.  Alternatively, Denison was told the value and the paragraph consists of inadmissible hearsay.  Paragraph 28 will be stricken.

Paragraphs 29 through 31 are not based on personal knowledge and will be stricken.  Paragraphs 32 and 33 are admissible.  Paragraphs 34 through 43 are not based on personal knowledge, but consist of hearsay and will be stricken.  For example, paragraphs 34, 36, 37, 41 and 42 all discuss the receipt of checks by Sun Life, which is obviously hearsay.  Denison has no foundation to

testify about the values discussed in paragraphs 38, 39 and 40, and must have been told those values. Denison left the employ of Debtor in June 2001, so could not personally know that Sun Life was paid through August 2001. Denison may have some knowledge of Robinson's leaving Debtor and returning two months later, but the statement regarding work falling behind in the benefits department is hearsay.

Based on the foregoing, the Court finds that Plaintiff's Motion to Strike the Denison Affidavit (doc 91) is well taken in part and will be granted in part.

**SUMMARY JUDGMENT**

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Bankruptcy Rule 7056[7]. In

---

[7] Bankruptcy Rule 7056 incorporates Fed.R.Civ.P. 56. The relevant version of Rule 56 provides:

**Summary Judgment**
(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.
(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.
(c) Motion and Proceedings Thereon. The motion shall
(continued...)

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 12 of 138

[7](...continued)
be served at least 10 days before the time fixed for
the hearing.  The adverse party prior to the day of
hearing may serve opposing affidavits.  The judgment
sought shall be rendered forthwith if the pleadings,
depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact
and that the moving party is entitled to a judgment as
a matter of law.  A summary judgment, interlocutory in
character, may be rendered on the issue of liability
alone although there is a genuine issue as to the
amount of damages.
(d) Case Not Fully Adjudicated on Motion.  If on motion
under this rule judgment is not rendered upon the whole
case or for all the relief asked and a trial is
necessary, the court at the hearing of the motion, by
examining the pleadings and the evidence before it and
by interrogating counsel, shall if practicable
ascertain what material facts exist without substantial
controversy and what material facts are actually and in
good faith controverted.  It shall thereupon make an
order specifying the facts that appear without
substantial controversy, including the extent to which
the amount of damages or other relief is not in
controversy, and directing such further proceedings in
the action as are just.  Upon the trial of the action
the facts so specified shall be deemed established, and
the trial shall be conducted accordingly.
(e) Form of Affidavits; Further Testimony; Defense
Required.  Supporting and opposing affidavits shall be
made on personal knowledge, shall set forth such facts
as would be admissible in evidence, and shall show
affirmatively that the affiant is competent to testify
to the matters stated therein.  Sworn or certified
copies of all papers or parts thereof referred to in an
affidavit shall be attached thereto or served
therewith. The court may permit affidavits to be
supplemented or opposed by depositions, answers to
interrogatories, or further affidavits.  When a motion
for summary judgment is made and supported as provided
in this rule, an adverse party may not rest upon the
mere allegations or denials of the adverse party's
pleading, but the adverse party's response, by
affidavits or as otherwise provided in this rule, must
                                    (continued...)

Page -13-

determining the facts for summary judgment purposes, the Court

may rely on affidavits made with personal knowledge that set

forth specific facts otherwise admissible in evidence and sworn

or certified copies of papers attached to the affidavits.

Fed.R.Civ.P. 56(e).  When a motion for summary judgment is made

and supported by affidavits or other evidence, an adverse party

may not rest upon mere allegations or denials.  <u>Id.</u>  Rather,

"Rule 56(e) ... requires the nonmoving party to go beyond the

pleadings and by her own affidavits, or by the 'depositions,

---

[7](...continued)
set forth specific facts showing that there is a
genuine issue for trial. If the adverse party does not
so respond, summary judgment, if appropriate, shall be
entered against the adverse party.
(f) When Affidavits are Unavailable.  Should it appear
from the affidavits of a party opposing the motion that
the party cannot for reasons stated present by
affidavit facts essential to justify the party's
opposition, the court may refuse the application for
judgment or may order a continuance to permit
affidavits to be obtained or depositions to be taken or
discovery to be had or may make such other order as is
just.
(g) Affidavits Made in Bad Faith.  Should it appear to
the satisfaction of the court at any time that any of
the affidavits presented pursuant to this rule are
presented in bad faith or solely for the purpose of
delay, the court shall forthwith order the party
employing them to pay to the other party the amount of
the reasonable expenses which the filing of the
affidavits caused the other party to incur, including
reasonable attorney's fees, and any offending party or
attorney may be adjudged guilty of contempt.

Page  -14-

answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." <u>Id.</u> The court does not try the case on competing affidavits or depositions; the court's function is only to determine if there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

In ruling on a motion for summary judgment, the trial court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party. <u>Mountain Highlands, LLC v. Hendricks</u>, 616 F.3d 1167, 1169-70 (10th Cir. 2010)(citing <u>Garrison v. Gambro, Inc.</u>, 428 F.3d 933, 935 (10th Cir. 2005)). On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment." <u>Id.</u> at 1170 (quoting <u>Cardoso v. Calbone</u>, 490 F.3d 1194, 1197 (10th Cir. 2007)) (internal quotation marks omitted). "If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all

issues concerning all other elements of the claim and any defenses become immaterial." <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670 (10th Cir. 1998)(citing <u>Celotex</u>, 477 U.S. at 322-23). "[F]ailure of proof of an essential element renders all other facts immaterial." <u>Mountain Highlands</u>, 616 F.3d at 1170 (quoting <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d 1202, 1212 (10th Cir.), <u>cert. denied</u>, 531 U.S. 926 (2000)).

New Mexico LBR 7056-1 governs summary judgment motions. It provides, in part:

> The memorandum in support of the motion shall set out as its opening a concise statement of all of the material facts as to which movant contends no genuine issue exists. The facts shall be numbered and shall refer with particularity to those portions of the record upon which movant relies.

> A memorandum in opposition to the motion shall contain a concise statement of the material facts as to which the party contends a genuine issue does exist. Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies, and shall state the number of the movant's fact that is disputed. All material facts set forth in movant's statement that are properly supported shall be deemed admitted unless specifically controverted.

**<u>FACTS</u>**

In these cross-motions for summary judgment, the facts derive from four sources: (1) Defendants Second Amended Answer (doc 42) to Plaintiff's Second Amended Complaint (doc 15) (numbered herein as facts 1 through 11); (2) Defendant's Amended Statement of Material Facts (doc 92) and Plaintiff's Response

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 16 of 138

thereto (doc 97)(numbered herein as facts 101 through 159); (3) Trustee's Statement of Supplemental Facts (part II of doc 70) and Defendant's Response thereto (doc 101)(numbered herein as facts 201 through 236); and (4) Trustee's Statement of Material Facts (doc 122) and Defendants Response (doc 125)(numbered herein as facts 301 through 346).[8]  As is apparent, the parties submitted a considerable number of proposed undisputed facts[9] which the Court has considered as appropriate.

## FACTS DERIVED FROM 2ND AMENDED ANSWER TO SECOND AMENDED COMPLAINT

These facts are from the Second Amended Answer (doc 42) to the Second Amended Complaint (doc 15).

1.    On February 8, 2001 (the "Petition Date"), Furr's Supermarkets, Inc., a Delaware corporation ("Furr's" or "Debtor") commenced the above-captioned voluntary bankruptcy case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code").

2.    On December 19, 2001, the Furr's chapter 11 bankruptcy case was converted to a chapter 7 case.  The Plaintiff was appointed the trustee on that date and continues in that capacity.

3.    The Defendant transacted business with Furr's in New Mexico.

_____

[8] The paragraphs of asserted material facts are consecutively numbered but there are gaps in the numbering.

[9] Typical of the parties' submissions is "Exhibit E (Part 4) to the Supplemental Extract of Discovery Supporting Defendant's Motion for Summary Judgment."  Doc 91.

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 17 of 138

4.   The Court has jurisdiction over the subject matter herein and the parties to this action.  This action is a core proceeding under 28 U.S.C. §1334 and 28 U.S.C. §157(b)(2)(F).  Venue is proper in this Court.

5.   Paragraph 5 alleges that after November 9, 2000, Furr's paid the Defendant the amounts set forth in Exhibit A to the Amended Complaint (doc 3) filed on February 7, 2003 (together "the Payments") on or after the dates set forth therein.  Defendant denied this paragraph, affirmatively stating that the Exhibit A was incorrect.  Defendant claims that it received only three separate checks during the preference period:

| Check number | Date | Amount |
|---|---|---|
| #25128092 | November 7, 2000 | $            44,850.65 |
| #225132000 | December 1, 2000 | $            44,570.16 |
| #2513688[10] | January 5, 2001 | $            90,477.43 |
| Total | | $           179,898.24 |

Defendant claims that there also may be additional errors on Exhibit A.  Trustee, in her Statement of Undisputed Facts, doc 122, ¶ 2, adopts Defendant's denial.  Therefore, the Court will deem this allegation withdrawn and rely on Trustee's doc 122, ¶ 2, which is duplicated as fact 302, below.

---

[10]This dollar amount should be $90,447.43.  Fact 327 shows that this is the sum of the November 2000 premium ($45,338.75) and December 2000 premium ($45,108.68).  <u>See also</u> fact 302 ($90,447.43).

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 18 of 138

6.    Each of the Payments was made for or on account of an antecedent debt owed by Furr's to Defendant (individually and collectively, the "Antecedent Debt").

7.    The Antecedent Debt was not a consumer debt.

8.    The Payments were made while Furr's was insolvent.

9.    The Payments were made within 90 days before the Petition Date (the "Preference Period").

10.   Defendant controverted paragraph 10[11].

11.   Defendant controverted paragraph 11[12].

**UNDISPUTED FACTS FROM DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**

These facts are from the Defendant's Amended Statement of Material Facts (doc 92) and Plaintiff's Response thereto (doc 97).

_____

[11]Paragraph 10 stated:
The Payments enabled the Defendant to receive more than it would have received had this bankruptcy case at all times been a case under chapter 7 of the Bankruptcy Code, the Payments had not been made, and the Defendant had received payment of the Antecedent Debt to the extent provided under the Bankruptcy Code.

[12]Paragraph 11 stated:
Pursuant to 11 U.S.C. §547(b), the Plaintiff has the right to a judgment against the Defendant for the aggregate amount of the Payments, together with any other payments made by Furr's to the Defendant during the Preference Period, if any, less any subsequent new value the Defendant pleads and proves it provided to Plaintiff, the amount of which, if any, Plaintiff does not know (the "Avoidable Amount"). Defendant did agree, however, that to the extent any payments are found preferential, it is entitled to credit for subsequent new value given to the Debtor.

Page -19-

101 - 103.[13]

104. The Debtor had approximately 2000 employees as Plan participants in any given Plan year.

105 - 110.

111. The Debtor's employees were paid on a weekly and/or biweekly basis.

112. At all times material herein the Debtor maintained two "controlled disbursement accounts" at First National Bank of Fairfield. Everything was paid through the controlled disbursement accounts. However, the Debtor also had other bank accounts, including a payroll account, a master operating account, a checking account used to pay vendors, landlords, and utility bills, and other accounts used to pay employee benefits, lottery payments, and money gram payments. All were "zero balance" accounts.

113. At all times material herein (2000 and 2001), at the time the Debtor issued and mailed or delivered checks to its employees, the Debtor had no money set aside in any specific bank account to "cover" said checks, and the Debtor had no money set aside in any specific bank account in regard to the monies "withheld" from its employees' pay checks. Similarly, at the time the Debtor issued and mailed checks to Sun Life the Debtor

---

[13]No text following a number means that the Court reviewed the fact, the objection to it, the affidavits or exhibits or legal arguments, and found a genuine issue of material fact.

had no money set aside in any specific bank account to "cover" said checks.  Rather, each business day the Debtor would take the income from sales and draw on its line of credit with Fleet (and later Heller) as necessary to meet the day's requirements, and wire transfer funds from its main operating account to the controlled disbursement accounts at First National Bank of Fairfield (to cover the checks clearing said bank that day). Ultimately, all of the Debtor's income from sales went directly to Heller (because it had a lien on all of the debtor's accounts), and Heller would then wire transfer funds to the Debtor's main operating account, which the Debtor then wired to one or both of the controlled disbursement accounts at First National Bank of Fairfield.

114. During the preference period the officers of the Debtor had discretionary authority regarding the disbursement of corporate funds, subject to obligations and limitations imposed by the secured creditors and by law.  Gene Denison had authority to approve invoices for payment.  However, nothing went out the door (nothing was paid) without the express approval of Tom Dahlen (CEO) or Steve Mortensen (CFO).

115. The Debtor filed a Chapter 11 Petition in bankruptcy on February 8, 2001, and continued as a debtor in possession until December 19, 2001.

116. As of the Petition Date the Debtor was a leading regional supermarket chain, with operations in New Mexico and western Texas. The Debtor employed approximately 4900 individuals, and operated 71 stores. The Debtor's work force consisted of approximately 4320 hourly employees and approximately 500 salaried employees. More than 3400 of the employees were part time employees.

117. Many of the Debtor's employees were unionized. The Debtor's collective bargaining agreements with its unions established pay rates, overtime pay, holiday pay, and other benefits. Said collective bargaining agreements required that the Debtor contribute certain amounts to the various Multi-Employer (Union) health and welfare, and pension plans.

118.

119. Duplicate of fact 302.

120. - 122.

123. As of the Petition Date, the Debtor considered its ability to rely on its employees to be a key component of the potential success of its business and its ability to reorganize and continue as a going concern. As of the Petition Date, the Debtor believed that its employees relied on their wages and salaries to pay basic living expenses, and that they relied on the employee benefits provided by the Debtor to secure the health and financial welfare of themselves and their families. As of the

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 22 of 138

Petition Date, the Debtor believed that any failure to pay Pre-Petition employee benefit obligations would create extreme personal hardship for many employees, destroy employee morale, and result in an unmanageable employee turnover.[14]

124. On February 8, 2001, the Debtor filed its Motion for Order Authorizing (A) Payment of Pre-Petition Employee Obligations and (B) Continuation of Employee Benefit Plans and Programs Postpetition (main case, doc. 12)("Employees Benefits Motion.")

125. On February 8, 2001 the Court entered an Order Authorizing (A) Payment of Pre-Petition Employee Obligations and (B) Continuation of Employee Benefit Plans and Programs Postpetition (main case, doc 28)("Employee Benefits Order.")

126. – 133.

134. From 1991 forward Lana Booth, now known as Lana Robinson ("Robinson"), an employee of the Debtor, was initially the Debtor's health benefits coordinator, then it's health benefits administrator, then its health benefits manager. Periodically the Debtor's employees filled out and submitted benefits enrollment forms to Robinson.

---

[14]Trustee objected to the last sentence as disputed. This statement derives directly from the Mortenson declaration (main case, doc 4) ¶ 54. Trustee did not direct the Court to anything in the record to contradict this statement. Therefore, the fact is deemed undisputed. NM LBR 7056-1.

135. Sun Life did not bill or invoice the Debtor.  Rather, toward the end of each month the Debtor's payroll department would run a "census" on the number of the Debtor's current employees.

136. During the middle of each month Robinson would submit "self bills" to the head of the Administrative Department of the Debtor (and beginning in early 2000 to the head of the Human Resources Department of the Debtor instead of to the Administrative Department).  Upon approval by the applicable department head, Robinson would write the date of approval and the word "Approved," and her name, "Lana Booth, Health Benefits Manager," on the self bills and submit them to the Debtor's accounting department.

137.

138. In December of 1999, as head of the Debtor's Administrative Department (as the Chief Administrative Officer), Gene Denison filled out and signed an Application for Group Insurance (the "Application") with Sun Life, and tendered a check in the amount of $38,071.31 for the estimated premium for January 2000. The date of the Application was December 30, 1999, and the "Effective Date" written on the Application was January 1, 2000. Subsequently, the check from the Debtor tendered with the Application was replaced by a check received by Sun Life on or about May 6, 2000.  A January 6, 2000 letter was sent from Sun

Life to the Debtor regarding the insurance benefits to be provided by Sun Life.

139. Summarized in table at fact 327.

140. Robinson left the Debtor's employment on approximately June 7th of 2000 and came back to work for the Debtor in the last part of August 2000, on a consulting basis at first, and then full time in September of 2000. During the period of Robinson's absence much of the work fell behind in the benefits department.

141. Summarized in table at fact 327.

142. Summarized in table at fact 327.

143. – 145.

146. Summarized in table at fact 327, and duplicate of fact 222.

147. Summarized in table at fact 327.

148. Summarized in table at fact 327.

149. Sun Life was paid in full for all insurance benefits provided to the Debtor and its employees (including spouses and children of employees) from January 1, 2000 through August 31, 2001.

150. Summarized in table at fact 327.

151.

152. As a result of the insurance coverage benefits provided by Sun Life to the Debtor and its employees (and dependents), Sun Life made the following payments to said employees, dependents, and beneficiaries for claims made as of August 31, 2001: Employee

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 25 of 138

Basic Life claims totaling $72,000: Dependent Basic Life claims totaling $2000; Employee Optional Life claims totaling $25,000; Dependent Optional Life claims totaling $10,000; AD & D claims totaling $10,000; Long-Term Disability claims totaling $42,318.60; and Short-Term Disability claims totaling $196,974.85.

153. In addition to the above described claims paid for claims made on or before August 31, 2001 (for the time period from January 1, 2000 through August 31, 2001), Sun Life will continue to make long-term disability payments to two former employees of the Debtor (one in the amount of $130 per month through January 2, 2022, and the other in the amount of $1,185 per month through October 23, 2027), so long as said employees continue to be totally disabled (within the meaning of the terms of the amended Policy), and are otherwise entitled to continuing benefits.

154. According to the Debtor's Schedules filed on March 26, 2001 the Debtor had $5,415,846.77 in unsecured priority claims.

155. As of November 8, 2005 the total amount received by the Trustee in all of the Trustee's Section 547 preference actions totaled $10,875,361.06. Additionally, as of said date the amount claimed in outstanding complaints and amounts awarded but uncollected totaled $2,268,443.23.[15]

---

[15]If the Trustee has some $13 million to distribute, there are approximately $ 9.782 million of priority wage claims for
(continued...)

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 26 of 138

156.

157. If this Case had been filed as a Chapter 7, Michael Caplan (the Trustee's expert) or any other appointed trustee would have attempted to hire a law firm to pursue preference and avoidance actions on a contingency fee basis, allowing them to receive a one third contingency for each preference recovery.

158. During the Chapter 11 the Debtor's employees created a preference screen and maintained the Debtor's computer system in operation. However, based on the assumption that without access to the Chapter 11 the Debtor's computer system (and the preference screen performed postpetition) would not have been available to the Trustee, Mr. Caplan is of the opinion that it is possible that the preference recovery would have been significantly less than $8 million.

159. In a hypothetical chapter 7 analysis virtually all of the recovery on preference and avoidance claims would have gone to priority tax claimants, employees, and other priority claims.

---

[15](...continued)
non-executive employees (fact 344) and $240,000 of priority wage claims for executive employees (fact 345) or roughly $10.0 million of wage claims that would be paid prior to unsecured creditors.  Debtor's Schedule F was over 2,700 pages long and totaled $151 million.  Debtor filed an amended Schedule F eliminating some creditors and omitting duplicate entries; amended Schedule F totaled $102 million.  The Trustee has represented to the Court repeatedly that she is not sure that wage claims will be paid in full after administrative expenses. In other words, there really is no question that Debtor was massively and hopelessly insolvent in the 90 days before the petition.

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 27 of 138

After those payments it is possible there would have been nothing left to pay general unsecured creditors. But even if there were anything left to pay general unsecured creditors, it would be in the nature of pennies on the dollar.

**UNDISPUTED FACTS FROM TRUSTEE'S STATEMENT OF SUPPLEMENTAL FACTS**

These facts are from the Trustee's Statement of Supplemental Facts (part II of doc 70) and Defendant's Response thereto (doc 101).

201. Fact 307 is more comprehensive.

202. The policy premium payments from Debtor to Defendant were due and payable monthly on the first day of each month.

203. Duplicate of fact 6.

204. Duplicate of fact 8.

205. Duplicate of fact 1.

206. Duplicate of fact 9.

207. Duplicate of fact 2.

208. Debtor and Debtor's bankruptcy estate do not owe Defendant any amount for unpaid insurance premiums.

209. Defendant was paid in full for all insurance coverage provided to Debtor or to Debtor's employees during the Preference Period.

210. Summarized in table at fact 327.

211. Duplicate of fact 149.

212. Duplicate of fact 211.

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 28 of 138

213. Debtor and Debtor's employees received all the benefits due to them under the terms of the insurance policy with Defendant and Defendant does not owe any product, service or performance to any of Debtor's former employees under the terms of the insurance policy, except to the extent that Defendant may continue to pay a long-term disability benefit claim approved while the insurance policy was in force. In response to this proposed fact, Sun Life asserts that, in fact, there are two long term claims. The Court finds the dispute not material.

214. Duplicate of fact 4.

215. In a hypothetical Chapter 7, the trustee would almost certainly abandon all encumbered assets, including the debtor's cash, inventory, store leases, equipment leases, warehouse lease, store fixtures, equipment, and liquor licenses, and/or the leases would be rejected by operation of law under the Bankruptcy Code, as there would be no equity in the assets that could be realized by the estate, and there would be no funds available to pay rent for the leased stores, for the leased warehouse in El Paso, or for leased equipment. The trustee would have no way to operate the debtor at all, much less for long enough to sell the assets, or to preserve the assets until a sale could be accomplished.

216.-220. The parties agree these are no longer relevant.

221. In Furr's chapter 11 case, there was never a deadline set or noticed for filing prepetition claims.

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 29 of 138

222. Debtor's payments to Sun Life made postpetition were authorized under the Code or by the Court, pursuant to 11 U.S.C. §§ 363, 1107 & 1108. They may also have been authorized by the Employee Benefits Order or some other order(s).

223.- 224. The parties agree these are no longer relevant.

225. As of the Petition Date, Furr's employee payroll was outstanding and owed; there were outstanding payroll checks from the prior week; and there were employment taxes owed on the outstanding payroll. The total of these amounts outstanding as of the Petition Date was approximately $3.5 million. As of the Petition Date, Furr's owed at least approximately $2.4 million in self-insured employee medical claims.

226. The Policy provided that the "Grace Period means the 45 days following a premium due date during which premium payment may be made." "If the Policyholder fails to pay any premium within the Grace Period, this Policy will terminate on the last day of the Grace Period." "The Grace Period is 45 days following a premium due date during which premium payment may be made. During the Grace Period the Policy shall continue in force, unless the Policyholder has given Sun Life written notice to discontinue this Policy. In any event, premiums are payable for any period of time the Policy remains in force." Sun Life could terminate this Policy on any premium due date by giving written notice to the Policyholder at least 60 days in advance. Sun Life admitted

this fact was not disputed, but added that Sun Life had agreed to a 60-day grace period and issued an amended policy on May 16, 2001, and it was attached to Dewar deposition as Exhibit 11.

227. Duplicate of fact 113.

228. Duplicate of fact 113.

229. Duplicate of fact 113.

230. Duplicate of fact 113.

231. The checks to Sun Life were drawn on the First National Bank at Fairfield account. With respect to checks to Sun Life, on the day the check was presented to Furr's bank, First National Bank of Fairfield, it would notify Furr's of the aggregate amount of all checks presented and Furr's would wire transfer that amount to the bank from the main operating account. Ms. Dunlap would make the calculations of inflows versus outflows and how much additional cash Furr's would need to meet that day's requirements and call Furr's lender and ask it to wire funds to the main operating account. In turn, Furr's would wire the funds from the main operating account to the bank in Fairfield.

232. All sales proceeds went into a main account each day. There was one collective pot [of money] for everything to go into and out of. There wasn't any one-to-one correlation of anything. All receipts from all stores, regardless of where it came from and regardless of where that money would ultimately be used for all went into one pot.

Page -31-

233. Furr's had systems in place that would transfer all funds collected in the stores into the main operating account every day. When Heller became Furr's lender, they settled up on a daily basis. This meant that all of the funds incoming were wired to Heller daily. Heller wired back the amount that was required to make all the payments on any given day.

234. Furr's relationship with its lender required that it settle up at the end of every day so that a minimal amount of funds was left in Furr's bank accounts. Any excess funds were used to pay down the line of credit every night. If a bank account ended up with something in it at the end of the day it was because Furr's missed the projections. Furr's used two "control disbursement accounts" one for vendors and expenses and an account used for payroll that both were maintained at a zero balance. Every day the bank notified Furr's how much in checks cleared and Furr's funded exactly what cleared each day.

235. Ms. Dunlap was Furr's cash manager. She would project the incoming amount of funds, basically the collections from the store accounts, and project the outflow of funds, be it payroll or benefits or taxes, et cetera, on a daily basis and what would be left, if any, at the end of the day, or what Furr's requirements for cash would be at the end of the day. Furr's was a net borrower. This meant that Furr's didn't have any cash of its own, and that all of the money in Furr's bank accounts,

including cash, was pledged to a lender. But, Sun Life commented that Furr's owned the cash it received from customers. This is probably true for every day until the funds were swept.

236. There were meetings held almost daily with Mr. Mortensen to decide which of Furr's vendors was going to get paid. Once a decision had been made about who was going to get paid, then checks were sent out to those entities. Ms. Dunlap prepared cash flow projections in part so that Furr's knew how much money was available so that Mr. Mortensen could then decide what checks to send out. Mr. Mortensen was the chief financial officer during the 90 days before the bankruptcy. He had the authority not to issue a check to any particular person or entity.

**UNDISPUTED FACTS FROM TRUSTEE'S STATEMENT OF UNDISPUTED FACTS**

These facts are from the Trustee's Statement of Material Facts (doc 122) and Defendant's Response thereto (doc 125).

301. Duplicate of fact 1.

302. Debtor paid Defendant a total of $179,868.24 (the "Payments") during the preference period in three (3) checks on the dates in the amounts described with the check numbers, amounts, payment due dates, check dates, dates received and dates

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 33 of 138

of honor set out below. Defendant received and negotiated the three checks described below.

| Check Nos. | Amounts | Payment due dates | Check Dates | Date Received | Date Honored |
|---|---|---|---|---|---|
| 25128092 | $44,850.65 | 9/1/00 | 11/7/00 | 11/13/00 | 11/15/00 |
| 25132000 | $44,570.16 | 10/1/00 | 12/1/00 | 12/11/00 | 12/14/00 |
| 25136888 | $90,447.43 | 11/1/00 & 12/1/00 | 01/5/01 | 01/16/01 | 01/17/01 |

(But see fact 327 (more comprehensive list.))

303. The policy premium payments from Debtor to Defendant were due and payable monthly on the first day of each month.

304. Duplicate of fact 6.

305. Duplicate of fact 8.

306. Duplicate of fact 9.

307. Duplicate of fact 2.

308. Duplicate of fact 4.

309. Duplicate of fact 113.

310. Duplicate of fact 230.

311. Duplicate of fact 231.

312. Duplicate of fact 232.

313. Duplicate of fact 233.

314. Duplicate of fact 234.

315. Duplicate of fact 235.

316. Duplicate of fact 236.

317. Duplicate of fact 112.

318. Duplicate of fact 113.

319. Duplicate of fact 134.

320. The Debtor's purchase of life, accidental death & dismemberment ("AD&D"), and disability insurance from Defendant (and prior to that, from Unum Life Insurance Company of America ("UNUM")) was part of an insurance program providing the Debtor's employees and their dependents with several different kinds of insurance.

321. Approximately half of Debtor's employees participated in the voluntary or optional coverage program.

322. Employee basic life, dependent basic life, employee basic AD&D, and employee short-term and long-term disability insurance premiums were paid by the Debtor on behalf of its employees. Employee and dependent (spouse and child) optional life and employee optional AD&D insurance (collectively, the "optional insurance") premiums were deducted from the employees paychecks. Moneys deducted from employee's checks to pay insurance premiums to Defendant did not exist at the time the paycheck was cut. There was no mechanism in place to segregate the money deducted from the employee paychecks. On the day the employee paychecks were cut, there wasn't any money anywhere designated to cover the checks or the withholding.

323. The Defendant did not bill or invoice the Debtor. Rather, toward the end of each month the Debtor's payroll department would run a "census" on the number of the Debtor's current employees. At the beginning of each month Robinson would take

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 35 of 138

the census from the end of the previous month and prepare "self bills" for the life, AD & D, and disability insurance provided by Sun Life.  Preparing the self bills involved determining how many employees (plus spouses and children) were eligible for what amount and type of coverage, and calculating the premiums to be paid by the Debtor and the premiums being withheld from the employees' wages.

324. (Duplicates 136 in part.)  During the middle of each month Robinson would submit the self-bills to the head of the Administrative Department of the Debtor (and beginning in early 2000 to the head of the Human Resources Department of the Debtor instead of to the Administrative Department).  Upon approval by the applicable department head, Robinson would write the date of approval and the word "Approved," and her name, "Lana Booth, Health Benefits Manager," on the self bills and submit them to the Debtor's accounting department.  The Debtor's accounting department would then prepare a check and print out a check stub and return the check and check stub to Robinson to mail out to Sun Life each month.

325. In preparing the self-bills, the Debtor did not know or try to determine what was deducted from employee wages.  Sun Life admitted that this fact was not disputed, but added:

> It is not accurate to say that in preparing the
> "self bills" the Debtor did not know or try to
> determine what was deducted from employee wages.  Lana
> Robinson, the Debtor's health benefits administrator,

did testify that she didn't always have verification
that amounts shown on employee's check stubs was
actually withheld.  Later on in her deposition she
testified that when she calculated the premiums for
voluntary life she never looked at what was deducted
from an employee's check.  Rather, she looked at the
number of lives that the Debtor's records showed to be
covered, whether or not they were receiving a paycheck,
and multiplied that by the rate based on the amount of
coverages they had.  She said that she never went back
and compared what was actually withheld from the
paychecks to the amount she calculated.  However, she
also said the actual amounts withheld from employee
paychecks should be close to the numbers shown on her
worksheets.

326. Duplicate of fact 226.

327. The following chart accurately reflects the premium payment

history by Debtor to Defendant.

| Premium Due Date | Premium Amount | Received by Sun | Coverage period | Check Date | Check Number | Check Amount |
|---|---|---|---|---|---|---|
| 1/1/00 | $38,071.31 | 5/18/00 | 1/2000 | 5/11/00 | 25095418 | $38,071.31 |
| 2/1/00 | $44,414.26 | 3/6/00 | 2/2000 | 2/25/00 | 25080702 | $44,414.26 |
| 3/1/00 | $44,970.49 | 4/25/00 | 3/2000 | 4/14/00 | 25090140 | $44,970.49 |
| 4/1/00 | $44,313.36 | 6/6/00 | 4/2000 | 5/26/00 | 25098164 | $44,313.36 |
| 5/1/00 | $44,313.36 | 7/11/00 | 5/2000 | 6/30/00 | See below | See below |
| 6/1/00 | $44,313.36 | 7/11/00 | 6/2000 | 6/30/00 | 25104681 | $88,626.72 |
| 7/1/00 | $45,046.52 | 9/19/00 | 7/2000 | 9/8/00 | 25117292 | $45,046.52 |
| 8/1/00 | $43,991.51 | 9/25/00 | 8/2000 | 9/19/00 | 25119241 | $43,991.51 |
| 9/1/00 | $44,850.65 | 11/13/00 | 9/2000 | 11/7/00 | 25128092 | $44,850.65 |
| 10/1/00 | $44,570.16 | 12/11/00 | 10/2000 | 12/1/00 | 25132000 | $44,570.16 |
| 11/1/00 | $45,338.75 | 1/16/01 | 11/2000 | 1/5/01 | See below | See below |
| 12/1/00 | $45,108.68 | 1/16/01 | 12/2000 | 1/5/01 | 25136888 | $90,447.43 |
| 1/1/01 | $46,763.01 | 3/5/01 | 1/2001 | 2/27/01 | See below | See below |
| 2/1/01 | $46,703.78 | 3/5/01 | 2/2001 | 2/27/01 | 30000610 | $93,466.79 |
| 3/1/01 | $44,961.79 | 5/1/01 | 3/2001 | 4/25/01 | 30004592 | $44,961.79 |
| 4/1/01 | $43,555.42 | 6/29/01 | 4/2001 | 6/1/01 | 40001787 | $43,555.42 |
| 5/1/01 | $43,190.63 | 6/29/01 | 5/2001 | 6/25/01 | 40003341 | $43,190.63 |
| 6/1/01 | $41,123.41 | 7/30/01 | 6/2001 | 7/23/01 | 40005482 | $41,123.41 |
| 7/1/01 | $39,087.98 | 11/14/01 | 7/2001 | 8/15/01 | See below | See below |
| 8/1/01 | $38,106.17 | 8/22/01 | 8/2001 | 8/15/01 | 40006722 | $77,194.15 |

Sun Life admitted that this fact was not disputed, but stated

that in the row beginning with 7/1/01, that the "Received by Sun"

Page -37-

date is not November 14, 2001, but August 22, 2001. Sun Life
cites to Trustee's Interrogatory No. 22 and Trustee's Request for
Admission No. 15 and Sun Life's responses thereto. The Court
finds this not material.

328. (Duplicates 208.) Debtor and Debtor's bankruptcy estate do
not owe Defendant any amount for unpaid insurance premiums.

329. (Duplicates 209.) Defendant was paid in full for all
insurance coverage provided to Debtor or to Debtor's employees
during the Preference Period.

330. Duplicate of fact 211.

331. Duplicate of fact 212.

332. Duplicate of fact 213.

333. Duplicate of fact 215.

334. The trustee in a hypothetical chapter 7 case would be
confronted with 71 closed supermarkets located throughout New
Mexico and west Texas, and no funds available to pay rent, to pay
for utilities or security, to pay employees or consultants or to
use for other purposes. Such a trustee would be confronted with
spoiling perishable products in 71 grocery stores, and likely
with a large number of angry former employees who did not receive
their last paychecks.

335. In a hypothetical Chapter 7, the trustee would encounter a
computer system that was fragile, and out-of-date, which pre-

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 38 of 138

petition required frequent interaction between Debtor's development staff and Lawson's Help Desk.

336. In a hypothetical Chapter 7, the computer system would have been shut down.  Because the systems were customized it would have required documentation of all the code customization in order for those working on a contingency basis for a trustee to understand all the intricacies of the system.  There would have been very little documentation to assist the trustee in retrieving information from the system.

337.- 340. The parties agree these are no longer relevant.

341. Duplicate of fact 221.

342. Duplicate of fact 222.

343. The parties agree this fact is no longer relevant.

344. Based on Furr's accounting records, on the Petition Date, Furr's owed at least $9,781,907.25 to its non-executive employees, capped at $4,300.00 per employee.  This amount is the total, limited to $4,300.00 for each individual, of (a) wages owed but unpaid on the Petition Date, (b) severance pay owed on the Petition Date, (c) accrued, unused and uncompensated vacation as of the Petition Date, and (d) the employer's portions of the Social Security, Medicare, state unemployment and federal unemployment taxes on unpaid wages, severance and vacation pay as of the Petition Date.  All of the wage and vacation amounts included in the above total were earned within 90 days before the

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 39 of 138

Petition Date.  The Social Security, Medicare, state unemployment and federal unemployment tax amounts are calculated on wage and vacation amounts earned within 90 days before the Petition Date and on the severance pay owed on the Petition Date; the calculation does not take into account certain federal & state excess wages per employee and does not include taxes on those excess wages.

345. As of the Petition Date, Furr's owed at least $236,707.11 to its employees that were on the executive payroll, capped at $4,300.00 per employee.  This amount is the total, limited to $4,300.00 for each individual, of (a) wages and salaries owed but unpaid on the Petition Date, (b) 3.75 days estimated accrued, unused and uncompensated vacation as of the Petition Date, and (c) the employer's portions of the Social Security, Medicare, state unemployment and federal unemployment taxes on unpaid wages and vacation pay as of the Petition Date.  All of the wage and vacation amounts included in the above total were earned within 90 days before the Petition Date.  All of the Social Security, Medicare, state unemployment and federal unemployment tax amounts are calculated only on amounts earned within 90 days before the Petition Date; the calculation does take into account certain federal & state excess wages per employee and does not include taxes on those excess wages.

Page -40-

346. As of the Petition Date, Furr's owed at least approximately $2.4 million in self-insured employee medical claims.

## DISCUSSION

## 1. Plaintiff's prima facie case

In this adversary proceeding the Plaintiff seeks to avoid a preferential transfer under Bankruptcy Code section 547. The United States Supreme Court discussed the policies underlying that section in Union Bank v. Wolas (In re ZZZZ Best Co., Inc.), 502 U.S. 151 (1991).

> The Bank and the trustee agree that § 547 is intended to serve two basic policies that are fairly described in the House Committee Report. The Committee explained:
>> "A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate. The purpose of the preference section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section-that of equality of distribution." [H.R. Rep. No. 95-595], at 177-178

> [(1977)], U.S. Code Cong. & Admin. News 1978, pp.
> 6137, 6138.

Id. at 160-61.

> To establish a voidable preference the Trustee
> must prove all five elements of § 547(b).  They are:
> any transfer of property of the debtor—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the
> debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
> (A) on or within 90 days before the date of the filing
> of the petition;...
> (5) that enables such creditor to receive more than
> such creditor would receive if—
> (A) the case were a case under Chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the
> extent provided by the provisions of this title.

Eckles v. Pan American Marketing (In re Balducci Oil Co.), 33

B.R. 843, 845 (Bankr. D. Colo. 1983).  There are actually six

elements, the five numbered elements plus proof that the transfer

was of property of the estate.  Before the Court considers

whether the Trustee has met her burden of proof in this case, the

Court will examine Sun Life's affirmative defenses to determine

if any of them preclude the Trustee's proof of any required

element.

## 2.   **Miscellaneous issues**

But, before addressing the individual affirmative defenses,

the Court wants to clarify a misunderstanding that pervades

preference cases, including a case from this Court that may have

helped create the misunderstanding.  See, e.g. Gonzales v. Food

Marketing Group (In re Furr's Supermarkets, Inc.), 320 B.R. 1, 6
(Bankr. D. N.M. 2004) ("[Section] 547(c) is the exclusive list of
defenses available to preferential transfers.")  This statement
does not mean that a defendant cannot challenge the elements that
a trustee must prove to establish a preference.  See 11 U.S.C. §
547(b).  In other words, a defendant is free to allege and
attempt to prove that the transfer was not made with debtor's
property, that it was not a creditor, that there was no
antecedent debt, that the payment was outside of the preference
period, that the debtor was solvent, or that receipt of the
payment did not improve its position.  See, e.g. Sloan v. Zions
First Nat'l Bank (In re Castletons, Inc.), 990 F.2d 551, 555
(10th Cir. 1993) (Trustee's avoidance claim rejected because "she
did not satisfy her burden of proof under § 547(b)(5)".)

    Nor, to be accurate, are the creditor's affirmative defenses
limited to section 547(c).  For example, a majority of courts
addressing the issue recognize a "contract assumption defense" as
a complete bar to preference recovery.  See Weinman v. Allison
Payment Systems, LLC (In re Centrix Financial, LLC), 434 B.R.
880, 885-886 (Bankr. D. Colo. 2010).  Similarly, as discussed
below, Sun Life has raised estoppel arguments as affirmative
defenses in this adversary proceeding.  Indeed, it is easy to see
how affirmative defenses such as accord and satisfaction,
payment, release, res judicata, statute of limitations and

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 43 of 138

waiver, all identified in Rule 8(c)(1), F.R.Civ.P., incorporated
into Rule 7008(a), F.R.B.P., come into play in a preference
action.

Rather, the statement necessarily means that, once the
elements of section 547(b) are proved and the preference
established, the only "preference-specific defenses" to the
trustee's recovery of that preference are those set forth in
section 547(c). <u>See</u> section 547(c) ("The trustee may not avoid
<u>under this section</u> a transfer....") (emphasis added); <u>Rushton v.
E & S Inter. Enter., Inc. (In re Eleva, Inc.)</u>, 235 B.R. 486, 488
(10th Cir. BAP 1999)("Once a trustee has established that a
transfer is a preference, a creditor may assert a defense as
provided in 11 U.S.C. § 547(c).")

The Court will also address several issues that are common
to several of Sun Life's defenses.  First, it does not matter
that Debtor obtained the funds used to pay Sun Life from
extensions on a line of credit by Heller.

> As a general rule, under § 547(b), a debtor's
> transfer of borrowed funds constitutes a preferential
> transfer of the debtor's property, assuming the other
> elements of that section are met.  <u>See</u> <u>Matter of Smith</u>,
> 966 F.2d 1527, 1537 (7th Cir. 1992) ("When a debtor
> effectively borrows nonearmarked funds and exercises
> control by using the funds to pay a preferred creditor
> over others, the estate has been diminished.").

<u>Bailey v. Big Sky Motors (In re Ogden)</u>, 314 F.3d 1190, 1199 (10th
Cir. 2002).  <u>See also</u> <u>Amdura Nat'l Distribution Co. v. Amdura
Corp., Inc. (In re Amdura Corp.)</u>, 75 F.3d 1447, 1451 (10th Cir.

1996)("We presume that deposits in a bank to the credit of a
bankruptcy debtor belong to the entity in whose name the account
is established."); Manchester v. First Bank & Trust Co. (In re
Moses), 256 B.R. 641, 645 (10th Cir. BAP 2000)(When debtor
borrowed money from his pension plan and paid off a bank loan,
that payment diminished his subsequent bankruptcy estate.  On the
petition date the funds were no longer available to pay unsecured
creditors.); Gray v. Travelers Ins. Co. (In re Neponset River
Paper Co.), 231 B.R. 829, 834 (1st Cir. BAP 1999)(Funds
transferred to a creditor came from an advance on a working
capital agreement that was accounted for on debtor's financial
statement as a liability.  The bankruptcy appellate panel held
that this was a transfer of debtor's property.) Accord Southmark
Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111, 1116 and
n.16 (5th Cir. 1995)(Same, and noting that any funds under
control of a debtor, regardless of the source, are properly
deemed to be the debtor's property.  Collecting cases.)

Second, earmarking does not apply in this case.

"In cases where a third person makes a loan to a debtor
specifically to enable him to satisfy the claim of a
designated creditor, the proceeds never become part of
the debtor's assets, and therefore no preference is
created.  The rule is the same regardless of whether
the proceeds of the loan are transferred directly by
the lender to the creditor or are paid to the debtor
with the understanding that they will be paid to the
creditor in satisfaction of his claim, so long as such
proceeds are clearly 'earmarked.'"  4 Collier on
Bankruptcy ¶ 547.25 at 547-(101-102) (15th ed. 1986).

Page -45-

Coral Petroleum, Inc. v. Banque Paribas-London (In re Coral Petroleum, Inc.), 797 F.2d 1351, 1356 (5th Cir. 1986). See also Moses, 256 B.R. at 650 (As the bottom line, if debtor controls the proceeds of a loan and is free to use the funds in any way, there is no earmarking.); Neponset River, 231 B.R. at 835 ("This control by the debtor of the distribution of funds precludes the application of the earmarking doctrine herein.")  There is nothing in the record that alleges that Heller required or instructed Debtor to pay Sun Life, and there are no allegations or evidence that Debtor was required to pay Sun Life.  And, debtor had control of the borrowed funds before they were transferred because they flowed through Debtor's account.  See Fact 113.

> Courts have used this dominion/control test to determine whether a transfer of property was a transfer of "an interest of the debtor in property." See, e.g., McLemore v. Third Nat'l Bank in Nashville (In re Montgomery), 983 F.2d 1389, 1395 (6th Cir. 1993); In re Smith, 966 F.2d 1527, 1531 (7th Cir. 1992).  Under this test, a transfer of property will be a transfer of "an interest of the debtor in property" if the debtor exercised dominion or control over the transferred property.  See id.

Parks v. FIA Card Services, N.A. (In re Marshall), 550 F.3d 1251, 1255 (10th Cir. 2008), cert. denied, 129 S.Ct. 2871 (2009).

And, finally, Sun Life argues "estoppel" several times in different contexts without specifying the exact flavor of the estoppel.  Black's Law Dictionary (9th ed. 2009) lists thirty-three types of estoppel.  The Court assumes that Sun Life is

arguing judicial estoppel, but the Court will also consider

application of collateral estoppel, equitable estoppel, and

promissory estoppel.

JUDICIAL ESTOPPEL

>The doctrine of judicial estoppel states that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." Davis v. Wakelee, 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895). While judicial estoppel is " 'probably not reducible to any general formulation of principle,' " New Hampshire v. Maine, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001), the following factors are crucial in deciding when to apply the doctrine:
>> First, a party's later position must be clearly inconsistent with its earlier position. Moreover, the position to be estopped must generally be one of fact rather than of law or legal theory. Second, whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.... Third, whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.
>Johnson v. Lindon City Corp., 405 F.3d 1065, 1069 (10th Cir. 2005) (internal citations and quotation marks omitted).

United States v. Villagrana-Flores, 467 F.3d 1269, 1278-79 (10th

Cir. 2006), cert. denied, 549 U.S. 1149 (2007). See also Kane v.

Nat'l Union Fire Ins. Co., 535 F.3d 380, 385-86 (5th Cir. 2008):

>"Judicial estoppel is a common law doctrine that prevents a party from assuming inconsistent positions in litigation." In re Superior Crewboats, Inc., 374

F.3d [330] at 334 [(5th Cir. 2004)] (citing <u>Brandon v.</u>
<u>Interfirst Corp.</u>, 858 F.2d 266, 268 (5th Cir. 1988)).
" 'The purpose of the doctrine is to protect the
integrity of the judicial process by preventing parties
from playing fast and loose with the courts to suit the
exigencies of self interest.' " <u>Id.</u> (quoting <u>In re</u>
<u>Coastal Plains, Inc.</u>, 179 F.3d [197] at 205 [(5th Cir.
1999)].  As an equitable doctrine, "[g]enerally,
judicial estoppel is invoked where 'intentional
self-contradiction is being used as a means of
obtaining unfair advantage in a forum provided for
suitors seeking justice.' " <u>Id.</u>  [sic][<u>Superior</u>
<u>Crewboats</u>, 374 F.3d] at 334-35 (quoting <u>Scarano v.</u>
<u>Cent. R.R. Co.</u>, 203 F.2d 510, 513 (3d Cir. 1953)).

Application of judicial estoppel is within the trial court's

discretion.  <u>Kane</u>, 535 F.3d at 384; <u>Matthews v. Denver Newspaper</u>

<u>Agency LLP</u>, 649 F.3d 1199, 1209 (10th Cir. 2011).

When analyzing judicial estoppel, the Court examines three

factors.  First, the later statement must clearly be inconsistent

with the party's earlier statement in litigation.  <u>See</u> <u>Cleveland</u>

<u>v. Policy Mgt. Systems Corp.</u>, 526 U.S. 795, 802 (1999) (The Court

of Appeals ruled that claims under both the Americans with

Disabilities Act and Social Security Disability Insurance were

directly conflicting: namely, "I am too disabled to work" and "I

am not too disabled to work." <u>Id.</u>  The Supreme Court examined

the actual language at issue and found that there were many

situations where an SSDI claim and an ADA claim could comfortably

exist side by side, and reversed the Court of Appeals.)  <u>Id.</u> at

803.  <u>See also</u> <u>Devan v. CIT Group Commercial Services, Inc. (In</u>

<u>re Merry-Go-Round Enter., Inc.)</u>, 229 B.R. 337, 345 (Bankr. D. Md.

1999)(The Maryland Bankruptcy Court found that statements of

solvency made by the debtor-in-possession ("DIP") in postpetition motions did not conflict with the allegations of trustee's preference complaint of preference-period insolvency because the DIP's motions did not even mention insolvency as defined by the code or the related concept of fair valuation.)

Inherent in the first factor is that the same party must make both representations, or perhaps they must be in privity with or bound by the acts and representations of the maker of the first statement. It does not impede the judicial process if two different parties make conflicting statements. See Meda v. Snell & Wilmer, L.L.P. (In re Schugg), 2009 WL 3132932 at *5 (D. Ariz. 2009)(Regardless of debtor's acts or omissions, Meda, the plan trustee, never made any inconsistent statements to the Court. Judicial estoppel did not apply.); The Liquidation Committee v. Binsky & Snyder, Inc. (In re J.A. Jones, Inc.), 361 B.R. 94, 104 (Bankr. W.D. N.C. 2007)("First, the Debtor's statements made in connection with the 2003 Motion are not binding on these post-confirmation creditor's committees, negating judicial estoppel."); and Id. at 105:

> Lastly, the use of judicial estoppel is inappropriate in this case because the "party to be estopped" would be the general body of unsecured creditors, not the party that made the statement, which is the Debtor. Certainly, Defendants have not identified any prior position or assertion by the Committees that is inconsistent with the one they have taken in these proceedings.

Another consideration for the first factor is whether the statements made were of "fact." Johnson v. Lindon City Corp., 405 F.3d at 1069 ("Moreover, the position to be estopped must generally be one of fact rather than of law of legal theory.") (Citing Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996), cert. denied, 519 U.S. 1113 (1997)). See also The Liquidation Committee, 361 B.R. at 105:

> Judicial estoppel cannot be applied to the statements relied upon by the Debtors in the 2003 Motion because they are not "assertions of fact." The application of judicial estoppel cannot be applied to an assertion of law. Pittston Co. v. United States, 199 F.3d 694, 701 n. 4 (4th Cir. 1999) ("[J]udicial estoppel applies only to the making of inconsistent statements of fact, and therefore is of no relevance to [the litigant's] legal contention ....."); Marathon Oil Co., 149 F.3d [283] at 292 [(4th Cir. 1998)]; Folio v. City of Clarksburg, 134 F.3d 1211, 1217–18 (4th Cir. 1998) ("[T]he position must be one of fact, rather than law or legal theory."). Defendants cite part of the 2003 Motion, which states, "the Subcontractors may have mechanic's liens and materialmen's lien rights" and "the Subcontractors may be secured creditors." Brief of Lorton Contracting Co. at 18, The Liquidation Committee v. Lorton Contracting Company, Case No. 05-3222 (Bankr. W.D. N.C. May 31, 2006) (emphasis added). Any statement regarding the validity of a mechanic's lien and/or a creditor's secured status is an assertion of law to which judicial estoppel does not apply.

See also Philip Services Corp. v. Luntz (In re Philip Services (Delaware), Inc.), 284 B.R. 541, 550 (Bankr. D. Del. 2002)("[T]he position must be one of fact, rather than law or legal theory."), aff'd., 303 B.R. 574 (D. Del. 2003). Compare New Hampshire v. Maine, 532 U.S. 742, 751 (2001)("New Hampshire's claim that the Piscataqua River boundary runs along the Maine shore is clearly

inconsistent with its interpretation of the words 'Middle of the River' during the 1970's litigation."); <u>Cleveland</u>, 526 U.S. at 802 ("This case does <u>not</u> involve ... directly conflicting statements about purely factual matters, such as 'The light was red/green,' or 'I can/cannot raise my arm above my head.'")(Emphasis in original.)(Holding that judicial estoppel did not apply). <u>See also</u> <u>Sturn v. Boker</u>, 150 U.S. 312, 336 (1893):

> What the complainant said in his testimony was a statement of opinion upon a question of law, where the facts were equally well known to both parties. Such statements of opinion do not operate as an estoppel. If he had said, in express terms, that by that contract he was responsible for the loss, it would have been, under the circumstances, only the expression of an opinion as to the law of the contract, and not a declaration or admission of a fact, such as would estop him from subsequently taking a different position as to the true interpretation of the written instrument.

The second factor in the judicial estoppel analysis directs the Court to examine whether the Court in fact accepted the first statement. If it has,

> judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled," <u>Edwards [v. Aetna Life Ins. Co.]</u>, 690 F.2d [595], at 599 [(6th Cir. 1982)]. Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," <u>United States v. C.I.T. Constr. Inc.</u>, 944 F.2d 253, 259 (5th Cir. 1991), and thus poses little threat to judicial integrity. <u>See</u> [United States v.] Hook, 195 F.3d [299], at 306 [(7th Cir. 1999)]; <u>Maharaj [v. Bankamerica Corp.]</u>, 128 F.3d [94], at 98 [(2nd Cir. 1997)]; <u>Konstantinidis [v. Chen]</u>, 626 F.2d [933], at 939 [(D.C. Cir. 1980)].

Page -51-

<u>New Hampshire</u>, 532 U.S. at 750-51.

Under the third factor the Court examines whether a party would gain an unfair advantage or impose an unfair detriment if not estopped by prior statements. <u>Id.</u> at 751.

COLLATERAL ESTOPPEL

Sun Life seeks to estop Plaintiff using a prior federal court order. "Federal principles of collateral estoppel apply to prior judgments that are rendered by a federal court." <u>McCart v. Jordana (In re Jordana)</u>, 232 B.R. 469, 475 (10th Cir. BAP 1999) (citing cases), <u>aff'd</u>., 216 F.3d 1087 (10th Cir. 2000)(Table).

> In order for collateral estoppel to apply, the following elements must be present: (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

<u>Id.</u> at 475-76 (Citation and internal quotation marks omitted.)

EQUITABLE ESTOPPEL

> There are four elements of a traditional estoppel claim: (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the other party's conduct to his injury.

<u>Spaulding v. United Transp. Union</u>, 279 F.3d 901, 909 (10th Cir.), <u>cert. denied</u>, 537 U.S. 816 (2002)(Citations omitted.)

PROMISSORY ESTOPPEL

> [T]he plaintiff must establish that a) defendant made a
> promise, b) the promise was made under circumstances
> where the promisor intended and reasonably expected the
> promise would be relied upon by the promisee, c) the
> promisee acted reasonably in reliance on the promise,
> and d) a refusal to enforce the promise would result in
> an injustice.

EDO Corp. v. Beech Aircraft Corp., 911 F.2d 1447, 1454 (10th Cir.
1990).

The Court will now address Sun Life's affirmative defenses.

**3.    Sun Life's Affirmative Defenses**

**A)    Employee Benefits Order**

Sun Life claims that the payments received were authorized
by the February 8, 2001 "Employee Benefits Order" (main case, doc
28) and that that order is now the law of the case.  The caption
of that Order is: Order Authorizing (A) Payment of Prepetition
Employee Obligations and (B) Continuation Of Employee Benefit
Plans and Programs Postpetition.  The Order provides, in part, 1)
the Debtor is authorized to pay or otherwise honor the
Prepetition Employee Obligations to, or for the benefit of, the
Employees; 2) the Debtor is authorized to continue postpetition
the employee benefit plans and programs in effect immediately
before the filing of this case; 3) the banks upon which any
checks are drawn in payment of the Prepetition Employee
Obligations, either before, on or after the petition date, are
authorized and directed to honor such checks upon presentation

any such checks; 4) the banks are authorized and directed to rely on the representations of the Debtor as to which checks are in payment of the Prepetition Employee Obligations;  5) the Debtor is authorized to pay any and all withholding taxes, social security taxes and other payroll taxes (local, state and federal), whether such taxes relate to the period before or after the Petition Date; 6) the banks upon which any checks are drawn in payment of such taxes, whether before, on, or after the Petition Date, are authorized and directed to honor such checks upon presentation any such checks; 7) neither the provisions contained in the order, nor any payments made by the Debtor under the Motion, shall be deemed an assumption of any employee benefit plan, program or contract, or otherwise affect the Debtor's rights under 11 U.S.C. §§ 365, 1113, or 1114 to assume or reject any executory contract between the Debtor, any employee, or any provider of employee services or benefits.

The caption of the Order is that it is "authorizing" Prepetition Employee Obligations and a Continuation Of Employee Benefit Plans. Black's Law Dictionary 133 (6th ed. 1990) defines "authorize" as "to empower", or "to permit a thing to be done in the future."  "Approval", in contrast, is defined as "the act of confirming, ratifying, assenting, sanctioning, or consenting to some act or thing done by another." Id. at 102.  Therefore, the caption makes clear that the order is dealing with things to be

done in the future, _i.e._, postpetition, and is not pertinent to things completed prepetition. Similarly, the decretal portion authorizes 1) the Debtor "to pay" certain things now unpaid; 2) the Debtor to continue benefit plans and programs postpetition; 3) banks to honor checks upon presentation; 4) banks to rely on the representations of the Debtor as to which checks are in payment of the Prepetition Employee Obligations; 5) the Debtor to pay any taxes; and 6) banks to honor tax checks upon presentation. Everything authorized would occur postpetition.

The Order does not approve anything that happened prepetition. Specifically it does not approve or ratify payments to Sun Life, which Defendant admits is not even mentioned by name in the Order. Furthermore, the Order specifically states:

> Neither the provisions contained herein, nor any payments made by the Debtor under the Motion, shall be deemed an assumption of any Employee benefit plan, program or contract, or otherwise affect the Debtor's rights under 11 U.S.C. §§ 365, 1113, or 1114 to assume or reject any executory contract between the Debtor, any Employee, or any provider of employee services or benefits.

Nothing in the Employee Benefits Motion contradicts or expands the relief granted in the Order. Therefore, neither the Motion or the Order have anything to do with the three payments Sun Life received and which had already cleared the bank before the petition was filed. The Motion and Order are totally irrelevant to whether Sun Life received a preference. See <u>Peltz v. Hartford Life Ins. Co. (In re Bridge Information Systems,</u>

Page -55-

Inc.), 321 B.R. 247, 254 (Bankr. E.D. Mo. 2005)(When benefit order authorized a debtor to pay for prepetition services but also expressly stated that it did not require assumption of an executory contract, it cannot insulate the creditor from a trustee's preference claim.)

Sun Life is essentially arguing that by filing the Employee Benefits Motion Debtor was seeking to abandon or release any preference claims related to the subject matter of those motions. First, it is clear that a preference action is property of the estate, and not property of the debtor. See 11 U.S.C. § 541(a) (The estate consists of all legal or equitable interests of the debtor in property as of the commencement of the case (except as specified) and, among other things, any interest in property that the trustee recovers under section 550 of this title.); Spicer v. Laguna Madre Oil and Gas, II, LLC (In re Texas Wyoming Drilling, Inc.), 422 B.R. 612, 632 (Bankr. N.D. Tex. 2010). Once a preferential transfer action is property of the estate, unless disposed of during a chapter 11 case it is still property of the estate upon conversion to Chapter 7. Id. at 633. Disposal of such an action would require a judgment, recovery, release, transfer or the equivalent to occur during the Chapter 11. Id. at 633-34. None of these occurred. See main case docket. Furthermore, no notice of any such disposition appears in the record. Nor were the preference claims settled, which would have

required notice under Bankruptcy Rule 9019(a). And, finally, the preference claims were not abandoned. Abandonment is governed by Section 544, and provides:

> § 554. Abandonment of property of the estate
> (a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.
> (b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.
> (c) Unless the court orders otherwise, any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.
> (d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.

The docket sheet does not show any motions to abandon, notices of proposed abandonment, or orders authorizing abandonment. In summary, the Court finds that this preference action is still property of the estate and that it has not been abandoned.

Sun Life cites to several cases in support of its defense A. One is directly on point, <u>Official Committee of Unsecured Creditors v. Medical Mutual of Ohio (In re Primary Health Systems, Inc.)</u>, 275 B.R. 709 (Bankr. D. Del. 2002), <u>aff'd</u>, C.A. No. 02-cv-00301-SLR (D. Del. Feb. 27, 2003)(unpublished). In <u>Primary Health</u> the unsecured creditors committee brought a preference action against the defendant, which filed a motion to

dismiss arguing that the payments it had received pre-petition
were authorized by a "benefits order" that authorized the debtor
to pay prepetition compensation and other employee benefits, and
that directed banks to honor checks, and authorized the debtor to
continue to make benefit payments.  Id. at 710.  The bankruptcy
judge dismissed the case, stating that the benefits order had
become the law of the case.  Id. at 711.  The court did not
address the fact that the order only authorized postpetition
transfers, not prepetition transfers.  Id.  Nor did that court
explain how an order could become law of the case as to
prepetition transfers when that issue was neither raised or
actually litigated.  See Octagon Resources, Inc. v. Bonnett
Resources Corp. (In re Meridian Reserve, Inc.), 87 F.3d 406, 409
(10th Cir. 1996):

> "The law of the case is a judicial doctrine designed to
> promote decisional finality.  Once a court decides an
> issue, the doctrine comes into play to prevent the
> re-litigation of that issue in subsequent proceedings
> in the same case."  Pittsburg & Midway Coal Mining Co.
> v. Watchman, 52 F.3d 1531, 1536 n. 4 (10th Cir. 1995).
> "The doctrine applies to issues previously decided,
> either explicitly or by necessary implication."  Guidry
> v. Sheet Metal Workers Int'l Ass'n, 10 F.3d 700, 705
> (10th Cir. 1993), reh'g on other grounds, 39 F.3d 1078
> (10th Cir. 1994) (en banc), cert. denied, 514 U.S.
> 1063, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995) (citation
> omitted).

First, the Court finds that the Employee Benefits Order in
this case is not the "law of the case" as to the recovery of
preferences.  The issue of preference liability was not raised,

and definitely not decided by the order, either explicitly or by implication. The order dealt only with postpetition payments of certain outstanding employee benefit prepetition liabilities and the ability to continue making employee benefit payments postpetition.

Second, this Court rejects the reasoning set out in <u>Primary Health</u>. Similarly, another bankruptcy judge from the District of Delaware declined to follow <u>Primary Health</u> in <u>HLI Creditor Trust v. Export Corp. (In re Hayes Lemmerz Int'l., Inc.)</u>, 313 B.R. 189, 193 (Bankr. D. Del. 2004):

> First, the payments at issue here were <u>not</u> made under the Critical Vendor Order; rather, they were made <u>before</u> the Critical Vendor Motion was filed and <u>before</u> the Critical Vendor Order was entered. Therefore, the payments at issue are not protected by the Order.

(Emphasis in original. Footnote omitted.) And, <u>id.</u> at 193-94:

> [T]he Critical Vendor Order did <u>not</u> identify Export as a critical vendor, did not <u>require</u> that Export's pre-petition claims be paid in full, and did not provide that any preferential payments <u>previously</u> made to Export could not be recovered. In fact, in granting the Critical Vendor Motion, there was no consideration or analysis of whether any potential critical vendor had received a preference.

(Emphasis in original.) The Court finds <u>Hayes Lemmerz</u> persuasive and adopts its reasoning.

Sun Life cited other cases which the Court also does not find persuasive. In <u>Seidle v. GATX Leasing Corp. (In re Airlift Int'l., Inc.)</u>, 778 F.2d 659, 660 (11th Cir. 1985), the Eleventh Circuit addressed the "tension" between section 547 (preferences)

Page -59-

and section 1110[16] (which allows a debtor's continued possession of aircraft after defaults are cured). Debtor and GATX entered a postpetition stipulation to cure defaults and retain an airplane. <u>Id.</u> at 661. The bankruptcy court approved the stipulation. <u>Id.</u> The 11th Circuit reasoned that the stipulation "secured" GATX's rights to receive payment in full, including prepetition defaults, and therefore there was no improvement in position as required by section 547(b)(5). <u>Id.</u> at 665.

In this case, Debtor never entered a stipulation to cure prepetition defaults[17], never gave notice of any such stipulation, never presented such a stipulation to the Court, and never assumed a contract with Sun Life. <u>See</u> absence of such a motion or notice on the docket. Therefore, this Court finds <u>Airlift Int'l.</u> unpersuasive.

---

[16]    [F]or purposes of the subsection 547(b)(5) analysis, sections 365 and 1110 work substantially the same. Section 1110 forces assumption or rejection of airline equipment contracts within sixty days of the petition where a typical executory contract may be assumed or rejected anytime prior to confirmation of a chapter 11 plan. <u>Compare</u> 11 U.S.C. § 365 <u>with</u> 11 U.S.C. § 1110. <u>Philip Services Corp.</u>, 284 B.R. at 552 n.10.

[17]Even assuming there is any statutory provision that would allow this, except through assumption. <u>See</u> section 365. Although not yet decided by the Tenth Circuit, a majority of courts addressing the issue recognize a "contract assumption defense" as a complete bar to preference recovery. <u>See</u> <u>In re Centrix Financial, LLC</u>, 434 B.R. at 886 and n.3.

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 60 of 138

Next, Sun Life cites <u>Alvarado v. Walsh (In re LCO Enter.)</u>, 12 F.3d 938, 942 (9th Cir. 1993), a case in which a debtor-in-possession assumed a lease of its business premises.

> Here, the lease was assumed. That assumption fixed Lincoln's right to immediate payment in full of the prepetition rent in exchange for LCO's continued possession of the property. The legal effect of that assumption is that the rent payments of $92,007.46 made within the preference period did not operate to improve Lincoln's position.

<u>Id.</u> Debtor never assumed any contract with Sun Life, so <u>LCO</u> is not persuasive.

Similarly, the ruling of <u>In re Superior Toy & Manufacturing Co., Inc.</u>, 78 F.3d 1169, 1172 (7th Cir. 1996), is that assumption of a contract gives the contracting party a secured interest in monies due; if the contract is not assumed, the contracting party is subject to section 547(b). <u>Superior Toy</u> is not applicable because Debtor never assumed a contract with Sun Life.

Finally, the Court does not understand Sun Life's citation of <u>Neuger v. United States (In re Tenna Corp.)</u>, 801 F.2d 819 (6th Cir. 1986) or <u>Marlow v. Rollins Cotton Company (In re Julien Co.)</u>, 202 B.R. 89 (W.D. Tenn. 1996), <u>aff'd. in part, vacated in part</u>, 146 F.3d 420 (1998) in the context of the Employee Benefits Order. Both of those cases discuss on what date the court conducts the hypothetical chapter 7 liquidation.

Page -61-

In summary, the Court finds that Sun Life's argument that the payments received were authorized by the February 8, 2001 "Employee Benefits Order" is not well taken.

**B)    Estoppel and Necessity of Payment Rule**

Sun Life next argues that the prepetition payments it received were authorized by estoppel and the "necessity of payment rule".[18]  In support of this argument, Sun Life claims that paragraphs 30 and 31[19] of the Employee Benefits Motion affirmatively stated that payment of the Prepetition Employee Obligations was authorized by 11 U.S.C. § 105 and the "necessity

_____

[18]It is difficult for the Court to conceive how payments received by Sun Life prepetition could have been "authorized" by pleadings filed postpetition that made no mention of those earlier payments or the identity of the recipients.

[19]Those paragraphs provide:
30.   The Debtor submits that this Court should authorize, under section 105(a) of the Bankruptcy Code, payment in full of the Prepetition Employee Obligations.  Section 105(a) provides that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."
31.   Under the "necessity of payment" rule, first enunciated by the Supreme Court in <u>Miltenberger v. Logansport, C. & S.W. R. Co.</u>, 106 U.S. 286 (1882), a bankruptcy court may use its section 105 equitable powers to permit a debtor-in-possession to pay prepetition claims when payment is necessary to effectuate a successful reorganization.  <u>See</u> <u>In re Lehigh & New England Ry. Co.</u>, 657 F.2d 570, 581 (3d Cir. 1981) (necessity of payment doctrine "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during the reorganization, payment may be authorized even if it is made out of corpus").

Page  -62-

of payment" rule.  Sun Life argues that because the Court granted
the Employee Benefits Motion, the payments made to Sun Life
during the preference period were in effect retroactively
authorized.  Sun Life, citing Primary Health, also argues that
this is now law of the case.

Sun Life's argument is not well taken.  As discussed
immediately above in the section dealing with the Employee
Benefits Order, the Employee Benefits Order did not pertain to
anything paid before the filing of the bankruptcy.  It did not
immunize anyone from preference liability.  And, as stated in the
motion's paragraph 31, the "necessity of payment doctrine
'teaches no more than, if payment of a claim which arose prior to
reorganization is essential to the continued operation of the
[business] during the reorganization, payment may be
authorized'".  It does not compel a debtor in possession to pay,
it merely authorizes it.  And, based on that authorization, the
Debtor in fact paid some prepetition amounts due to Sun Life
after the petition and entry of the Employee Benefits Order.
Finally, the Court does not find that the order was law of the
case.  The Plaintiff in this case is not violating the Employee
Benefits Order by filing this adversary.

Furthermore, the Court finds that estoppel does not apply.
First, Plaintiff is not judicially estopped for several reasons.
Plaintiff is the Chapter 7 trustee, a representative of unsecured

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 63 of 138

creditors, and not in privity or bound by the Chapter 11 Debtor. Meda, 2009 WL 3132932 at *5; The Liquidation Committee, 361 B.R. at 104; Texas Wyoming Drilling, 422 B.R. at 635 ("Yet the creditors have not contradicted themselves in court.")(Citations omitted, emphasis in original.)(Holding that Chapter 7 trustee is not judicially estopped by the debtor-in-possession, but that, even if he were, conversion cured the defect.)  Second, the Court does not find that the Debtor's earlier statement that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during the reorganization, payment may be authorized" actually conflicts with the Plaintiff's current statement that during the preference period, this creditor unfairly received more than other unsecured creditors and the payment should be recovered.  Finally, the Court does not find that the equities of the case require the Plaintiff to not pursue this preference.  The preference arose when the case was filed, it was always there for either the Debtor in Possession or the Trustee to pursue for the benefit of all unsecured creditors, and nothing the Debtor-in-Possession did should change that.  In fact, it would be inequitable for Sun Life to retain more than its fair share of the estate.

       The Court also finds collateral estoppel does not apply. The issues are simply not the same.  Neither the Chapter 7 Trustee nor Sun Life were involved in the Employee Benefits

Motion or its resolution and had no opportunity to litigate a position.  And, finally, neither equitable estoppel or promissory estoppel apply because there are no allegations that Sun Life relied on any representation or that it was reasonable in doing so.  The Court specifically finds that Sun Life would not have been reasonable relying on the Employee Benefits Motion and Order as a release of preference liability because that issue is not addressed in the motion or order.

## C.   Course of dealing and the Employee Benefits Order

Sun Life argues that the payments received were authorized through the course of dealing between Sun Life and Debtor after the filing and by the Employee Benefits Order.  Debtor paid the January, 2001 and first 8 days of February, 2001 (i.e., prepetition) premiums postpetition pursuant to the Employee Benefits Order on March 5, 2001.  Sun Life argues that this demonstrates that, had it not been paid at all in the preference period, it would have received all unpaid premiums pursuant to the Employee Benefits Order.  Sun Life cites GATX, 778 F.2d at 665, for the proposition that if GATX had not been paid pre-petition it would have received payment postpetition when the bankruptcy court approved its stipulation with the debtor.

Sun Life's fanciful argument is based on pure speculation and is not susceptible to proof.  The Employee Benefits Order authorized payments, but did not compel them.  In this case,

Page -65-

Debtor did not enter a stipulation with Sun Life postpetition. Therefore, <u>GATX</u> is inapt. Similarly, Debtor did not assume any contract with Sun Life that would have given it the contract assumption defense.

**D)** **Plan Assets Fiduciary, ERISA Technical Trust, and/or Constructive Trust.**

Sun Life's argument D focuses on the fact that property held in trust by a debtor does not become property of the bankruptcy estate. <u>See</u> 11 U.S.C. § 541(d); <u>Cunningham v. Brown</u>, 265 U.S. 1, 11 (1924); <u>EBS Pension, L.L.C. v. Edison Brothers Stores, Inc. (In re Edison Brothers Stores, Inc.)</u>, 243 B.R. 231, 235 (Bankr. D. Del. 2000):

> [C]ourts have concluded that property which a debtor holds in trust (express or constructive) for another does not become property of the estate when the debtor files for bankruptcy. <u>See, e.g.</u>, <u>In re Columbia Gas Systems, Inc.</u>, 997 F.2d 1039, 1059 (3d Cir. 1993) ("Congress clearly intended the exclusion created by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust").

And,

> In order to establish rights as a trust recipient, a claimant must make two showings: (1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust funds if they are commingled." <u>Goldberg v. New Jersey Lawyers' Fund</u>, 932 F.2d 273, 280 (3d Cir. 1991). The identification of the trust funds is a question of federal law. <u>See id.</u> and cases cited therein.

Page -66-

Id. at 238.  See also Hatoff v. Lemons & Assoc., Inc. (In re
Lemons & Associates, Inc.), 67 B.R. 198, 213 (Bankr. D. Nev.
1986)(Same.);

## 1.  **Plan Assets Fiduciary**

Sun Life states that $64,737.02 out of the three checks
constituted amounts "withheld" by the Debtor from its employees'
paychecks, and $115,131.22 out of the three checks, constituted
the Debtor's "employer contributions" to pay premiums for
employee and dependent basic life, employee basic AD & D, and
employee short term and long term disability insurance.
Therefore, Sun Life argues that the funds withheld from
employees' paychecks and paid to Sun Life, together with the
employer contributions paid to Sun Life[20], did not constitute
property in which the Debtor had an interest at the time of
payment, and/or said withheld funds constituted moneys held in
trust (either a technical trust or a constructive trust) that the
Debtor was required by federal law (the Employee Retirement
Income Security Act of 1974, 29 U.S.C. § § 1001, et. seq)
("ERISA") to pay to Sun Life.

---

[20]Because the analysis of employee withholdings is different
from the analysis of employer contributions, each is discussed
separately.  See Trustees of the Colorado Ironworkers Pension
Fund v. Popovich (In re Popovich), 359 B.R. 799, 802 (Bankr. D.
Colo. 2006)(Stating that there is a "significant" difference
between employee contributions and employer contributions in any
trust analysis.)

Sun Life argues that Debtor was both the plan sponsor and the plan administrator.[21] It claims that Debtor exercised discretionary authority and/or control with respect to management of the plan and/or management or disposition of assets.[22] Sun Life argues that this control is evidenced by terminating one insurance company in December 1999 and starting a policy with Sun Life in January 2000, by withholding and contributing funds, and by terminating the contract with Sun Life in August, 2001[23]. By

---

[21]Plaintiff disputes this but it is not material.

[22]Fact 115 states, in part: "During the preference period the officers of the Debtor had discretionary authority regarding the disbursement of corporate funds, subject to obligations and limitations imposed by the secured creditors and by law."

[23]But see 29 C.F.R. § 2509.75-8, D-2:
Q: Are persons who have no power to make any decisions as to plan policy, interpretations, practices or procedures, but who perform the following administrative functions for an employee benefit plan, within a framework of policies, interpretations, rules, practices and procedures made by other persons, fiduciaries with respect to the plan:
...
(3) Preparation of employee communications material;
(4) Maintenance of participants' service and employment records;
...
(7) Orientation of new participants and advising participants of their rights and options under the plan;
(8) Collection of contributions and application of contributions as provided in the plan;
...
(11) Making recommendations to others for decisions with respect to plan administration?

A: No. Only persons who perform one or more of the
(continued...)

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 68 of 138

using this language, Sun Life is attempting to prove that Debtor was a plan fiduciary and thereby bootstrap the existence of a trust.

> Section 3(21)(a) of ERISA, 29 U.S.C. § 1002(21)(a), defines a person as a fiduciary of an ERISA plan to the extent that he:

> (i) [E]xercises any discretionary authority or discretionary control respecting management of such plan <u>or exercises any authority or control respecting management or disposition of its assets</u>, (ii) he

---

[23](...continued)
functions described in section 3(21)(a) of the Act with respect to an employee benefit plan are fiduciaries. Therefore, a person who performs purely ministerial functions such as the types described above for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.

However, although such a person may not be a plan fiduciary, he may be subject to the bonding requirements contained in section 412 of the Act if he handles funds or other property of the plan within the meaning of applicable regulations.

The Internal Revenue Service notes that such persons would not be considered plan fiduciaries within the meaning of section 4975(e)(3) of the Internal Revenue Code of 1954.

The Court questions whether changing insurance companies or terminating the plan altogether is the type of behavior that would classify Debtor as a fiduciary. It is not alleged that Debtor had any influence on Sun Life's internal administration of benefits, eligibility, investment policy, etc.

Page -69-

renders investment advice for a fee or other
compensation, direct or indirect, with respect to any
moneys or other property of such plan, or has any
authority or responsibility to do so, or (iii) he has
any discretionary authority or discretionary
responsibility in the administration of such plan.
(emphasis added). The definition, thus, encompasses a
variety of duties commonly performed by fiduciaries,
including the providing of investment advice,
administrative control over a plan, advising on whom to
retain as legal or investment advisors to a plan, and,
ultimately, how to invest plan assets. Once deemed a
fiduciary, either by express designation in the plan
documents or the assumption of fiduciary obligations
(the functional or de facto method), the fiduciary
becomes subject to ERISA's statutory duties. These
duties, as summarized by the Supreme Court, "relate to
the proper management, administration, and investment
of fund assets, the maintenance of proper records, the
disclosure of specified information, and the avoidance
of conflicts of interest." Mass. Mut. Life Ins. Co. v.
Russell, 473 U.S. 134, 142-43, 105 S.Ct. 3085, 87
L.Ed.2d 96 (1985).

Navarre v. Luna (In re Luna), 406 F.3d 1192, 1201 (10th Cir.

2005).

    In Pegram v. Herdrich, 530 U.S. 211, 224 (2000), the United

States Supreme Court recognized that trustees of ERISA plans have

similar duties to those imposed on common law trustees. But, it

noted that under the common law a trustee is prohibited from

placing himself in a position where it would be in his benefit to

violate his duty to the trust beneficiaries. Id. at 225. In

contrast, an ERISA fiduciary may have financial interests adverse

to the beneficiaries. Id. "ERISA does require, however, that

the fiduciary with two hats wear only one at a time, and wear the

fiduciary hat when making fiduciary decisions." Id. (Citation

omitted.)  The statute defines an administrator as a fiduciary only "to the extent" that he acts in such a capacity.  <u>Id.</u> (Citing 29 U.S.C. § 1002(21)(a).)

Therefore, in every case charging breach of fiduciary duty the threshold question is not whether someone adversely affected the plan's beneficiaries' interest, but whether the person was acting as a fiduciary when taking the action subject to the complaint.  <u>Id.</u> at 225-26.

## 1(A).      <u>Plan Assets Fiduciary - Employer Contributions</u>

The <u>Luna</u> case, although involving dischargeability under section 523(a)(4) for breach of fiduciary duty, is relevant to the current case.  The issue was whether the Lunas, as owners of Luna Steel Erectors, Inc. ("Steel") were fiduciaries of Steel's ERISA plan.  <u>Id.</u> at 1197.  Steel ceased operations owing over $121,000 of employer contributions[24] to the plan.  <u>Id.</u>  The bankruptcy court found that ERISA imposed fiduciary obligations that would satisfy the requirements of section 523(a)(4), but the unpaid contributions were not plan assets and thus there was no defalcation.  <u>Id.</u> at 1198.  The district court affirmed.  <u>Id.</u>

The Tenth Circuit disagreed that unpaid contributions were not plan assets.  <u>Id.</u> at 1120.  The Court instead found that while the ERISA plan did not have a present interest in the

---

[24]"[A]t no point did the Lunas withhold any portion of their employees' wages."  <u>Luna</u>, 406 F.3d at 1197.

unpaid contributions until they were paid, it did have a future
interest in the contractually owed contributions.  Id.  "A future
interest in property is 'an interest ... which is not, but may
become a present interest.'"  Id. at 1199 (Citing Restatement
(First) of Property § 153(1)(a) (1936).)  Based on this finding,
the plan had a contractual right to collect the contributions.
Id. at 1200.

     Next, the circuit court addressed the issue of whether the
Lunas were ERISA fiduciaries.  Id. at 1201.  The Court cited
Pegram, 530 U.S. at 225, for the proposition that ERISA trustees
can "wear different hats" and an employer fiduciary can have
interests adverse to employer's interests.  Luna, 406 F.3d at
1202.  Therefore, the court reframed the issue as whether the
Lunas exercised any "authority or control respecting management
or disposition of plan assets."  Id.

     Recall, in Pegram, 530 U.S. at 225-26, the Supreme Court
stated that the threshold issue was whether the defendant was
acting as a fiduciary when taking the action subject to the
complaint.  In the instant case, all premiums were paid to Sun
Life but the trustee is attempting to recover some of them.  So,
the relevant issues are 1) whether the Debtor was acting as a
fiduciary when it made the payments, and/or 2) were the funds
paid to Sun Life "trust funds" or had they lost that status.

Page  -72-

But, as discussed below, in the end it does not matter whether the Debtor was a fiduciary or not.[25]

The Luna court found it obvious that it was the plan trustee who had the right to collect the unpaid contributions from the Lunas, and that the Lunas had "no say" over whether that right would be enforced or not. Id. at 1202. Consequently, the Lunas were not fiduciaries as to the unpaid contributions.

The Luna court went further and stated that, even if the unpaid contributions themselves were plan assets, the statutory definition of an ERISA fiduciary would not be met because there

---

[25]Sun Life also argues that the funds in its hands are trust funds and therefore not recoverable. This is not the law. See Kupetz v. United States (In re California Trade Technical Schools, Inc.), 923 F.2d 641 (9th Cir. 1991). California Trade Technical Schools ("CTTS") wrongfully diverted Title IV (Higher Education Act of 1965) trust funds intended for student beneficiaries to general operating expenditures. Id. at 644-45. The Department of Education ("DOE") demanded restitution. Id. at 645. CTTS repaid the funds in several transfers stating its intention was to replace the trust funds. The last transfer was 89 days before CTTS's bankruptcy. Id. at 647. The Ninth Circuit recognized that in the hands of DOE the funds were trust funds. Id. But, it found that the status of the funds in CTTS's hands "at the time of that transfer" (i.e., the restitution payment on the 89th day prior to bankruptcy) governed avoidability. Id. (Emphasis in original.) The Court noted that CTTS had dissipated the diverted trust funds for operations and the funds were not traceable, so DOE was a general, unsecured creditor. Id. (Citing Collier on Bankruptcy, ¶ 541.13 at 541-79.) The court restated the issue as whether the restitutional deposit was itself an avoidable transfer. Id. It found the transfer preferential. Id. at 648.

Therefore, Sun Life's argument that Plaintiff cannot recover trust funds fails.

were no earmarked or segregated funds.[26]  Id. at 1204.

Similarly, in this case Debtor had no earmarked or segregated

funds and would not meet the definition of an ERISA fiduciary.

The court also analyzed the status of the Lunas under the

common law of trusts.  It found that making contractually owed

contributions to an ERISA plan had little to do with traditional

fiduciary responsibilities.  Id.  It stated that the relationship

between the Lunas and the plan was best characterized as

contractual, not fiduciary.  Id. (Citing Restatement (Third) of

Trusts § 5(i) and cmt. i ("A contract to convey property does not

give rise to a fiduciary relationship.") and § 5(k) and cmt. k

("A debtor does not as such stand in a fiduciary relationship to

his or her creditors.  A creditor as such has against the debtor

merely a personal claim, which can be enforced by judicial

proceedings to reach the debtor's property.[27]")

_____

[26]See discussion below regarding tracing.

[27]Comment k continues with a discussion of employer/employee
relationships:

     Often agreements are made between an employer and
its employees under which the employer is to deduct
certain amounts from the wages of the employees and is
either to hold those amounts as trustee or to transfer
the amounts to another as trustee of a fund (such as a
retirement fund) for the benefit of the employees.  In
such a case, a trust arises as to the amounts deducted
as soon as they are either set aside by the employer
for the employees' purposes or paid over to another
person for those purposes.  Until then, the employer's
obligation is merely a debt, with the "obligee" (the
employer or other person) holding a chose in action
     (continued...)

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 74 of 138

The Court summarized by stating that a delinquent employer-contributor is merely a debtor, not a fiduciary. Id. at 1205. It found that the Lunas' decision to use their limited funds to pay other business expenses rather than to make plan contributions was a "business decision, not a breach of fiduciary duty." Id. at 1207. Accord Rahm v. Halpin (In re Halpin), 566 F.3d 286, 290 (7th Cir. 2009):

> We agree with the Department's interpretation that employer contributions become assets only after being paid. Under "ordinary notions of property rights," if a debtor fails to meet its contractual obligations to a creditor, the creditor does not automatically own a share in the debtor's assets. The creditor, rather, has a "chose in action," an assignable contractual right to collect the funds owed by the debtor. See Mexican Nat'l R.R. Co. v. Davidson, 157 U.S. 201, 206, 15 S.Ct. 563, 39 L.Ed. 672 (1895). As one treatise explains, "[t]he terms 'choses in actions' and 'debts' are used by courts to represent the same thing when viewed from opposite sides. The chose in action is the right of the creditor to be paid, while the debt is the obligation of the debtor to pay." 63C Am.Jur.2d Property § 22 (2008). Accordingly, the unpaid amounts are debts; they are not assets held in trust for the benefit of the creditor.
> Trust law similarly supports this analysis. Cf. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110-11, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (directing courts to consider trust law when "develop[ing] a federal common law of rights and obligations under ERISA-regulated plans." (internal quotation marks omitted)). Under well-settled principles of trust law,

[27](...continued)
(the claim against the employer) in trust. The claim that is held in the trust estate is like the claims of the other general creditors of the employer except to the extent of any preference that may be conferred by statute or other rules of law or equity, preferences that are not peculiar to the trust law.

a debtor-creditor relationship is not a fiduciary
relationship.  <u>See</u> Restatement (Third) of Trusts § 5(k)
& cmt. k (indicating that the relationship of a debtor
to a creditor is not fiduciary in nature; rather the
creditor has a personal claim against the debtor); <u>see
also</u> <u>id.</u> at § 5(i) & cmt. i (stating that a contract to
convey property does not give rise to a fiduciary
relationship).  Indeed, the Restatement of Trusts
explains that, with regard to amounts deducted by an
employer for eventual contribution on behalf of an
employee, "[a] trust arises as to the amounts deducted
as soon as they are either set aside by the employer
for the employees' purposes or paid over to another
person for those purposes.  Until then, the employer's
obligation is merely a debt, with the 'obligee' ...
holding a chose in action ... in trust." <u>Id.</u> at § 5
cmt. k.

(Footnote omitted.)  <u>See also</u> <u>Trustees of the Graphic</u>

<u>Communications International Union Upper Midwest Local 1M Health</u>

<u>and Welfare Plan v. Bjorkedal</u>, 516 F.3d 719, 732 (8th Cir. 2008)

("The fiduciary status applies, however, only when the individual

is performing a fiduciary duty; it 'is not an all-or-nothing

concept'".)(Citing <u>Darcangelo v. Verizon Communications, Inc.</u>,

292 F.3d 181, 192 (4th Cir.2002)).; <u>id.</u> (The threshold question

is whether the defendant was acting as a fiduciary.)(Citing

<u>Pegram</u>, 530 U.S. at 226); <u>id.</u> (Corporate assets do not become

plan assets simply because they are owed.); <u>id.</u> at 733 (Owners of

company with ERISA plan failed to make contributions.  "An act of

omission fails to satisfy the requirement that the individual

<u>exercise</u> discretionary authority over plan assets.  <u>See</u> § [29

U.S.C.] 1002(21)(A)(i).")(Emphasis in original.)  <u>See also</u> <u>COB</u>

<u>Clearinghouse Corp. v. Aetna U.S. Healthcare, Inc.</u>, 362 F.3d 877, 881-82 (6th Cir.), <u>cert. denied</u>, 543 U.S. 870 (2004):

> Whether an employer who is also an ERISA plan sponsor is a fiduciary of the plan generally requires a detailed analysis of the employer's actions and whether those actions were performed in the employer's fiduciary capacity. <u>See</u> <u>Hunter v. Caliber Sys., Inc.</u>, 220 F.3d 702, 718 (6th Cir. 2000). "[W]e must examine the conduct at issue to determine whether it constitutes 'management' or 'administration' of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary duties." <u>Id.</u> (citations and internal quotations omitted).

The Court concludes that Debtor was not an ERISA fiduciary with respect to the employer contributions before they were paid. This conclusion is based primarily on the fact that, until the funds were paid, there were no funds; there was only an unsecured obligation to pay them. A debt is not a trust. Restatement (Third) of Trusts § 5(k) (2003). <u>See also</u> <u>Halpin</u>, 566 F.3d at 290 ("[E]mployer contributions became plan assets only after being paid.")

**1(B).**      **<u>Plan Assets Fiduciary - Employee Withholdings</u>**

In <u>Luna</u>, the Tenth Circuit noted that the Lunas never withheld any portion of their employee's wages. <u>Luna</u>, 406 F.3d at 1197. However, in dicta the court advised:

> Our holding that employers who fail to pay contractually-owed contributions to a plan are not, by virtue of that fact alone, fiduciaries, must be distinguished from the situation where an employer has control over funds that were withheld from employees' pay checks. Where the issue is not employer contributions (as here), but rather employee

Page -77-

> contributions held by the employer, courts will
> recognize that the employer meets ERISA's statutory
> definition of a fiduciary. See, e.g., Phelps v. C.T.
> Enters., Inc., 394 F.3d 213, 219 (4th Cir. 2005)
> ("Where ... an employer is entrusted with employee
> funds for remittance to a claims administrator ... the
> employer is acting in a fiduciary capacity under
> ERISA.").

Id. at 1206, n. 13. But, although the court recognized that other jurisdictions impose fiduciary obligations regarding withheld funds, it also noted that under the Restatement (Third) of Trusts § 5, cmt. k the trust arises as to the amounts deducted when they are either set aside or paid over to another person. Id. at 1205, n. 11. Until then, the employer's obligation is merely a debt. Id. "Thus, according to the Restatement, a trust arises only when an employer actually deducts and sets aside amounts from an employee's salary." Id. at 1206. Therefore, it appears that the Tenth Circuit might find a fiduciary duty with regard to withheld funds (as for, e.g., section 523(a)(4) dischargeability purposes), but be unable to find any specific trust property if the debtor chose to spend the funds instead of depositing them (setting them aside) into a trust account.

Undisputed facts 113, 232 and 322 demonstrate that employees' payroll checks were "net" checks after deductions, and when issued there were no funds in the bank to cover either the net checks or the amounts listed as withheld. All funds were commingled. The amounts withheld were not segregated and there was not even a method in place to segregate them. Debtor had to

Page -78-

borrow money from Heller to cover each paycheck as it cleared the bank, and had to borrow from Heller to pay payroll taxes and the amounts due to Sun Life. None of the payments to Sun Life were timely in the preference period. Fact 327.

The Court finds that Debtor never set aside withheld funds. Under <u>Luna</u>, the funds became trust funds only when Debtor paid them to Sun Life. Until then, Debtor owed an unsecured debt to Sun Life. Also, according to the <u>Luna</u> court, the statutory definition of ERISA fiduciary is not met unless there are earmarked or segregated funds. <u>Luna</u>, 406 F.3d at 1204. Consequently, Debtor was not an ERISA fiduciary when paying Sun Life.

In conclusion, the Court finds that Sun Life's argument that the transfers are unavoidable because the funds were all plan assets in the hands of the Debtor as fiduciary and not property of the Debtor as Debtor is not well taken. However, even if Debtor were a fiduciary as to employee withholdings, that would

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 79 of 138

not end the inquiry.  For, in bankruptcy court, there usually[28]
is no trust if there is no identifiable res.

## 2.    ERISA Technical Trust and/or Constructive Trust.

## 2(A) ERISA Technical Trust

---

[28]In Begier v. Internal Revenue Service, the United States
Supreme Court addressed the question of whether income tax
withheld from employees and excise taxes collected from its
customers were "property of the debtor" when paid to the Internal
Revenue Service out of the debtor's general operating account in
the period preceding the debtor's bankruptcy.  496 U.S. 53, 59
(1990).  The Court examined the Internal Revenue Code's trust-
fund tax provision, 26 U.S.C. § 7501: "Whenever any person is
required to collect or withhold any internal revenue tax from any
other person and to pay over such tax to the United States, the
amount of tax so collected or withheld shall be held to be a
special fund in trust for the United States."  Id. at 60.  Begier
argued that the debtor had never segregated the taxes but rather
paid them from its general operating account.  Id.  The Supreme
Court dismissed this argument, finding that the statute did not
require segregation.  Id.  The Court acknowledged that under
common-law principles a trust is created in property and does not
come into existence until the settlor identifies the trust res.
Id. at 62.  But, a § 7501 trust is "radically different" from the
common-law paradigm; § 7501 provides that the "amount" collected
or withheld is placed in trust, not specific property.  Id.  The
Court noted that "the common law of trusts is not binding on
Congress."  Id. at n.4.  Justice Scalia concurred in the
judgment.  Id. at 67.  Writing separately, he agreed that § 7501
obviously gave the United States the advantages of being a trust
beneficiary.  Id. at 70.  But, he believed that "[a] trust
without a res can no more be created by legislative decree than
can a pink rock-candy mountain."  Id.  He concurred in the
judgment because he believed that even if there was no trust
before the debtor paid the tax, when it wrote the check to the
government it came into being.  Id. at 71.  He further observed
that, ordinarily, a debtor's alienation of property by placing it
in a trust would constitute a transfer and a preference.  Id.
But, he believed that § 7501 expressed an intention to create an
"immediate" trust from the time of the collection or withholding,
so the payment would not be preferential.  Id.

A trust consists of three elements: 1) a trustee who holds trust property and administers it for the benefit of one or more others; 2) one or more beneficiaries to whom the trustee owes duties with respect to the trust property; and 3) trust property, which is held by the trustee for the beneficiaries. Restatement (Third) of Trusts § 2 cmt. f (2003). Either or both of elements (1) and (2) may be temporarily absent without destroying the trust or preventing its creation. Id. A trust cannot be created unless there is trust property. Id. cmt. i. The trustee has a duty to see that trust property is designated or identifiable as property of the trust, and also a duty to not commingle the trust property. Id. § 84. If a trustee wrongfully disposes of trust property and uses the proceeds to acquire other property, the beneficiary is entitled either to enforce a constructive trust of the property acquired, or to enforce an equitable lien on that property, as long as the product of the trust property is held by the trustee and can be traced. Restatement (Second) of Trusts § 202(1) (1959)[29]. On the other hand, if the trustee wrongfully disposes of trust property and dissipates the proceeds or does

---

[29]"No one except a beneficiary or his agent can maintain a suit against the trustee to enforce the trust or to enjoin redress for a breach of trust." Restatement (Second) of Trusts § 200 (1959). "A person who incidentally benefits from the performance of the trust, but who is not a beneficiary of the trust, cannot maintain a suit to enforce the trust." Id. cmt. c. Sun Life is at most an incidental beneficiary of the trust in this case. Sun Life was a party to an insurance policy with the Debtor and therefore a creditor.

not preserve the property or no longer has the property or the beneficiary cannot trace the property, the beneficiary has a claim against the trustee for breach of trust and is a general creditor.  Id. § 202(2) (1959).  To successfully trace trust property the beneficiary must prove the trustee once had the trust property or its product and must prove that the trustee still holds the property, or property which is in whole or in part the product of the trust property.  Id. cmt. on subsection (2).  If the proceeds have been dissipated or if the beneficiary cannot trace the property, the beneficiary has only a general unsecured claim against the trustee.  Id.

Technical trusts are those which arise by law before any wrongdoing, but not involving a traditional declaration of trust, a clearly defined trust, and an intent to create a trust relationship.  Berres v. Bruning (In re Bruning), 143 B.R. 253, 256 (D. Colo. 1992).  Technical trusts arise as a result of defined obligations imposed upon a debtor by state or federal statute.  Cundy v. Woods (In re Woods), 284 B.R. 282, 288 (D. Colo. 2001)(citing In re Romero, 535 F.2d 618, 622 (10th Cir. 1976)).  "For a state statute to create an express or technical trust ... the statute must define the trust res, establish trustee duties, and impose the trust prior to any wrongdoing creating the obligation."  Tway v. Tway (In re Tway), 161 B.R. 274, 279 (Bankr. W.D. Okla. 1993).

Page  -82-

There is no real dispute that ERISA creates a statutory

trust. 29 U.S.C. § 1103, Establishment of trust, provides in

part:

> (a) Benefit plan assets to be held in trust; authority
> of trustees.
> Except as provided in subsection (b) of this section,
> all assets of an employee benefit plan shall be held in
> trust by one or more trustees. ...
> (b) Exceptions[30]
> The requirements of subsection (a) of this section
> shall not apply--
> (1) to any assets of a plan which consist of insurance
> contracts or policies issued by an insurance company
> qualified to do business in a State;
> (2) to any assets of such an insurance company or any
> assets of a plan which are held by such an insurance
> company; ...

"Plan assets" in turn are defined in 29 U.S.C. § 1002(42) as:

"plan assets as defined by such regulations as the Secretary may

prescribe, ..."  The applicable regulation appears at 29 C.F.R. §

2510.3.102(a)(1):

> General rule. ... [T]he assets of the plan include
> amounts (other than union dues) that a participant or
> beneficiary pays to an employer, or amounts that a
> participant has withheld from his wages by an employer,
> for contribution or repayment of a participant loan to
> the plan, as of the earliest date on which such
> contributions or repayments can reasonably be
> segregated from the employer's general assets.

---

[30]The parties did not address exceptions (b)(1) or (2),
which superficially seem to apply.  This Court will also not
address them because they do not impact the result.  Even when an
exception to 29 U.S.C. § 1103(a) applies, there is still a
fiduciary duty to ensure that employee contributions are not used
for the company's operating expenses.  Phelps v. CT Enter., Inc.,
194 Fed.Appx. 120, 124, 2006 WL 2310665 at *3 (4th Cir. 2006)
(per curiam) (unpublished).

The Luna court noted that the definition of plan assets does not address employer contributions.  Luna, 406 F.3d at 1199 n. 3.

> [T]he Department of Labor has instructed that "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law. In general, the assets of a welfare plan would include any property, tangible or intangible, in which the plan has a beneficial ownership interest." Department of Labor Advisory Opinion No. 93-14A (May 5, 1993), 1993 WL 188473, at *4.

Id. at 1199.  The Court concluded:

> Under ordinary notions of property rights, an ERISA plan does not have a present interest in the unpaid contributions until they are actually paid to the plan.  In other words, the plan cannot use, devise, assign, transfer, or otherwise act upon contributions that it has not yet received.  This does not mean, however, that the plan has no property interest in the unpaid contributions.  It does.  Pursuant to ordinary notions of property rights, the plan holds a future interest in the collection of the contractually-owed contributions.  A future interest in property is "an interest ... which is not, but may become a present interest."  Restatement (First) Property § 153(1)(a) (1936).  A chose in action, for example, is a future interest, and, like all property interests, it is transferrable.  See id. § 163 cmt. b.  Applying these principles here, although the plan does not possess the unpaid contributions themselves, it does possess the contractual right to collect them.

Id. at 1199-1200 (Footnotes omitted; emphasis in original).

Putting these concepts together, the property of an ERISA trust consists of: 1) all property previously paid into or forwarded to the trust and any net earnings thereon, 2) funds that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution [to] or repayment of a participant loan from the

Page -84-

plan, as of the earliest date on which such contributions or repayments can reasonably be segregated from the employer's general assets, 3) a future interest[31] in the collection of items specified in number 2) until the date they "can reasonably be segregated from the employer's general assets", and 4) a future interest in contractually-owed employer contributions[32].

The fiduciary duties of an ERISA trustee are set forth in 29 U.S.C. § 1104. The most important for our purposes is § 1104(a)(1)(A). ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--(A) for the exclusive purpose of: (i)

---

[31]The Luna court observed that a future interest in property is an interest which is not now a present interest but may become one. Luna, 406 F.3d at 1199. Conversely, it may never become a present interest.

[32]The Court finds that the relaxed tracing rules of Begier should not apply in this situation. In Begier, Justice Scalia recognized that placing an asset into trust is a "transfer" and could possibly be a preference. 496 U.S. at 71. He viewed 26 U.S.C. § 7501 as creating an "immediate" trust at the time that the taxes were collected or withheld. Under ERISA 1) the employer contributions do not become trust funds until paid and 2) the employee contributions either become trust funds when segregated (29 C.F.R. 2510.3-102) or paid (Luna, Restatement (Third) of Trusts). This delay does not necessitate an "immediate" trust, but rather creates an opportunity for erstwhile trust funds to lose that character. If the funds lose their status as trust funds, it breaks the "nexus" required for Begier tracing. See Morin v. CERES Corp. (In re AAPEX Systems, Inc.) 273 B.R. 35, 43 and 44 n. 10 (Bankr. W.D. N.Y. 2002)(Begier allows "reasonable assumptions" for tracing, but when trust funds are not segregated and the bank account is subsequently overdrawn there is "absolutely no connection" between the trust funds and the remaining bank balance.), aff'd., Morin v. Frontier Business Technologies, 288 B.R. 663 (W.D. N.Y. 2003).

providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan.")
Prohibited transactions for the fiduciary are set out in 29
U.S.C. § 1106. The two most important for our purposes are §
1106(a)(1)(B) ("(1) A fiduciary with respect to a plan shall not
cause the plan to engage in a transaction, if he knows or should
know that such transaction constitutes a direct or indirect--
...(B) lending of money or other extension of credit between the
plan and a party in interest.") and § 1106(b)(1) ("A fiduciary
with respect to a plan shall not--(1) deal with the assets of the
plan in his own interest or for his own account.")

It is undisputed that Debtor did not segregate[33] employee
withholdings. Had Debtor promptly paid Sun Life, it would have
reduced the amounts available for other borrowing. So, instead
of paying the withholdings within a reasonable time Debtor

---

[33]    One of the fundamental principles of trust law is that
        a fiduciary has the duty to separate strictly trust
        property from his own property and to avoid the
        commingling of funds. The segregation of funds serves
        to prevent conflicts between a fiduciary's personal
        interests and his duty of loyalty to the beneficiary of
        the trust. See Bird v. Stein, 258 F.2d 168, 177 (5th
        Cir. 1958), cert. denied, 359 U.S. 926, 79 S.Ct. 608, 3
        L.Ed.2d 628 (1959); Restatement (Second) of Trusts §
        179. This duty to segregate trust assets applies not
        only to traditional trusts but also to benefit plans
        covered under ERISA. See, e.g., Corley v. Hecht Co.,
        530 F.Supp. 1155, 1163 (D.D.C.1982) (holding employer
        liable for breach of fiduciary duty for failure to
        segregate trust assets).
Professional Helicopter Pilots Ass'n v. Denison, 804 F.Supp.
1447, 1452-53 (M.D. Ala. 1992).

borrowed funds daily to pay other general operating expenses. Then, months later it would borrow funds to make its late payments to Sun Life. We do not know when Debtor could have segregated the assets, only when it actually did. The substance of this transaction was that Debtor borrowed and commingled the withheld funds, used them for other expenses and purposes, and then repaid the borrowed funds to Sun Life with the proceeds of new borrowings.

To summarize the analysis to this point, Sun Life argues that the funds are not recoverable because they were not "property of the debtor" because they were funds from an ERISA trust. Assuming arguendo that Sun Life need not trace its receipts to any actual funds, those receipts nevertheless consisted of the employer's share and each employee's share. The employer's share does not become a plan asset until received so at the time of the payment to Sun Life it was not yet a trust fund. The employee's share is also probably not a plan asset until paid under the <u>Luna</u> and Restatement (Third) theories. But, even if the employee's share was an amount held in trust, Debtor dissipated it by paying expenses with it. Once trust funds are transferred to a bona fide purchaser for value neither the trustee or the beneficiary have any further claim to them. <u>Research Planning, Inc. v. Segal (In re First Capital Mortgage Loan Corp.)</u>, 917 F.2d 424, 427 (10th Cir. 1990); <u>see also</u>

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 87 of 138

Restatement (First) of Trusts § 74 cmt. a (1935)(Beneficiary loses interest in trust property when transferred to a bona-fide purchaser.)  Rather, the beneficiary has a cause of action against the trustee for breach of its fiduciary obligations.  Id. See also Kupetz, 923 F.2d at 648:

> While there appears to be no case law directly addressing whether a debtor-trustee's deposit of non-trust funds into a trust account by way of restitution constitutes a preference subject to avoidance, the facts of the April 26 deposit clearly fit the language of section 547.  The money paid back into the account consisted of property that could have been used to satisfy the claims of CTTS's creditors, and was therefore property of the estate under Danning [v. Bozek (In re Bullion Reserve of North America), 836 F.2d 1214 (9th Cir.), cert. denied, 486 U.S. 1056 (1988)].  Because the trust funds originally diverted were dissipated and could not be traced, DOE stood in the position of a general creditor with regard to those funds.  Collier on Bankruptcy ¶ 541.13, at 541-79.  Having been made for DOE's benefit, the deposit satisfies the requirement that the transfer be "to or for the benefit of a creditor," under section 547(b)(1).  The parties agree that the deposit was made in payment of a debt that CTTS had owed DOE since at least January, 1983.  Thus the April 26 deposit was made "on account of an antecedent debt," as required by section 547(b)(2).  There is no dispute regarding either CTTS's insolvency, under section 547(b)(3), or the fact that April 26, 1983 fell within ninety days of CTTS's filing, under section 547(b)(4).  The facts reflect that DOE's position was effectively identical to that of CTTS's other general creditors and that all of CTTS's creditors stood to receive less than their full claims.  The government concedes that it received more by the $211,682.02 deposit than it would have had the deposit not been made and had CTTS's estate been liquidated according to the provisions of the Bankruptcy Code, as required by § 547(b)(5).  We therefore find that the April 26th deposit constitutes an avoidable preference under section 547.

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 88 of 138

(Footnote omitted.)  Finally, <u>see</u> <u>Schifter v. First Fidelity</u>
<u>Financial Services, Inc. (In re First Fidelity Financial</u>
<u>Services, Inc.)</u>, 36 B.R. 508, 510-11 (Bankr. S.D. Fla. 1983)(When
trustee of express trust fails to preserve the trust intact and
commingles it with his own funds, there is a breach of fiduciary
duty and the express trust no longer exists.  The beneficiaries
have at most an interest in a constructive trust.)  This suggests
that Sun Life was not paid with ERISA trust funds, but rather
with borrowed funds.  This defense is not well taken.

### 2(B) Constructive Trust

Before undertaking the determination of whether the unpaid
funds were subject to a constructive trust, the Court must
consider whether imposition of a trust would be equitable.  <u>Hill</u>
<u>v. Kinzler (In re Foster)</u>, 275 F.3d 924, 927 (10th Cir. 2001).
To do this, the Court must weigh the claims of the other
creditors before employing any equitable fictions.  <u>Id.</u> at 928.
One factor is whether other similarly situated creditors would be
harmed.  <u>Id.</u>  <u>See also</u> <u>Kalish v. The Landing (In re The Landing)</u>,
160 B.R. 820, 824 (Bankr. E.D. Mo. 1993):

> The practical effect of a constructive trust in a
> bankruptcy case is to elevate a plaintiff's claims
> above the claims of all other creditors because assets
> in a constructive trust are not part of the bankruptcy
> estate.  <u>See</u> <u>In re Kennedy & Cohen</u>, 612 F.2d [963] at
> 965 [(5th Cir. 1980)].  In the matter being considered
> here, if such a trust were imposed, the Plaintiffs
> would receive value before any other creditors of the
> Chapter 11 estate.  The Plaintiffs would also receive a
> return of their investment in Option I (a separate

Page -89-

debtor) ahead of all other creditors in that separate
Chapter 7 liquidation proceeding. These results would
disrupt the orderly system of distribution of assets
established in the Code. The congressionally mandated
scheme of priorities is to be respected and enforced by
the Bankruptcy Courts.

In this case, Sun Life received all amounts due, both pre-
and postpetition. Fact 328. If Plaintiff is successful in this
case, Sun Life would repay the preference and have an unsecured
claim for the amount repaid. 11 U.S.C. § 502(h)[34]. This would
equalize Sun Life's treatment with the other unsecured
prepetition creditors who did not receive a 100% return. The
Court finds that it would not be equitable to allow Sun Life
better treatment than others in its same class. See, e.g.,
Edmondson v. Bradford-White Corp. (In re Tinnell Traffic
Services, Inc.), 41 B.R. 1018, 1021-22 (Bankr. M.D. Tenn. 1984)
(Court refuses to recognize constructive trust containing funds
obtained by fraud because it would harm other creditors.) This
is particularly true given the fact that Debtor did not assume
its contract with Sun Life, nor did the Debtor provide any notice
to other unsecured creditors that would have allowed them to
object to the unequal treatment.

However, even if the Court found this to be a situation
calling for an equitable adjustment to distribution, Sun Life
cannot establish a trust. The claimant of an ownership interest

---

[34]Section 502(h) gives to a creditor that returns a
preference a claim that is treated as if it arose prepetition.

in property that would otherwise be considered a part of the bankruptcy estate must be able to identify and trace the property to which he claims ownership.  Hill v. Kinzler (In re Foster), 275 F.3d 924, 926-27 (10th Cir. 2001); Jobin v. Youth Benefits Unlimited, Inc. (In re M & L Business Machine Co.), 59 F.3d 1078, 1081 (10th Cir. 1995) (Citations omitted.); Sender v. The Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Investment Assoc., Inc.), 48 F.3d 470, 474 (10th Cir. 1995)("It is beyond peradventure that, as a general rule, any party seeking to impress a trust upon funds for purposes of exemption from a bankruptcy estate must identify the trust funds in the original or substituted form.")(quoting First Federal of Michigan v. Barrow (In re Salem Mortgage Co.), 878 F.2d 912, 915 (6th Cir. 1989)); Rollins v. Metropolitan Life Ins. Co., 912 F.2d 911, 915 (7th Cir. 1990)(Same.)  Furthermore, Begier's relaxed tracing rules do not apply to constructive trusts.  Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.), 371 F.3d 397, 402 (8th Cir. 2004)(A constructive trust contains property wrongfully obtained by another and is therefore a trust in specific property, not a trust in an amorphous amount.)(Citation omitted.); Official Committee of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.), 432 B.R. 135, 158 n. 81 (Bankr. D. Del. 2010) (Citing MJK Clearing, 371 F.3d at 402); Rocin Liquidation Estate

v. Alta AH & L (In re Rocor Int'l, Inc.), 352 B.R. 319, 329

(Bankr. W.D. Ok. 2006)(To impose a constructive trust, the

preference defendant must both trace the funds and prove fraud.)

A concept entwined with tracing is the "lowest intervening

balance rule." United States Dept. of Energy v. Seneca Oil Co.

(In re Seneca Oil Co.), 906 F.2d 1445, 1451 (10th Cir. 1990).

That rule provides:

> [W]hen a trustee has commingled trust funds with his
> own funds, the creditor may recover the lowest balance
> to which the common fund has been depleted, on the
> theory that the trustee is presumed to use the
> trustee's own money first. See In re Mahan & Rowsey,
> 817 F.2d [682] at 684 [(10th Cir. 1987)]; Ayers v. Fay,
> 187 Okl. 230, 102 P.2d 156, 159 (1940).

See also Cunningham, 265 U.S. at 11-12:

> [T]o succeed they must trace the money, and therein
> they have failed. It is clear that all the money
> deposited by these defendants was withdrawn from
> deposit some days before they applied for and received
> payment of their unmatured notes. It is true that by
> the payment into the account of money coming from other
> banks and directly from other dupes the bank account as
> such was prevented from being exhausted; but it is
> impossible to trace into the Hanover deposit of Ponzi
> after August 1st, from which defendants' checks were
> paid, the money which they paid him into that account
> before July 26th. There was, therefore, no money
> coming from them upon which a constructive trust, or an
> equitable lien could be fastened. Schuyler v.
> Littlefield, 232 U.S. 707, 34 Sup. Ct. 466, 58 L. Ed.
> 806 [(1914)]; In re Mulligan (D. C.) 116 Fed. 715 [(D.
> Mass. 1902)]; In re Matthews' Sons, 238 Fed. 785, 151
> C. C. A. 635 [(2nd Cir. 1916), cert. denied, 243 U.S.
> 647 (1917)]; In re Stenning, [1895] 2 Ch. 433 [1895 WL
> 9888)]. In such a case, the defrauded lender becomes
> merely a creditor to the extent of his loss and a
> payment to him by the bankrupt within the prescribed
> period of four months is a preference. Clarke v.
> Rogers, 228 U. S. 534, 33 Sup. Ct. 587, 57 L. E. 953

[(1913)].  In re Door, 196 Fed. 292, 116 C. C. A. 112
[(9th Cir. 1912)]; In re Kearney (D. C.) 167 Fed. 995
[(E.D. Pa. 1909)].

Cunningham strongly suggests that when an account is depleted of
its fraudulently obtained funds, subsequent replenishments do not
restore the tainted funds as trust funds, but replaces them free
of the trust.  This is also the holding in Frontier Pepper's
Ferry, LLC v. Landamerica 1031 Exchange Services, Inc. (In re
Landamerica Financial Group), 2009 WL 1269578 at *12 (Bankr. E.D.
Va. 2009):

> The operating account of LES was swept daily.  Once the
> account went to zero, tracing became impossible as a
> matter of law.  "[E]ven assuming the existence of a
> trust relationship, a creditor cannot sufficiently
> identify or trace the trust res through a commingled
> fund where the fund is too small to satisfy the claims
> of similarly situated parties." In re Lemons &
> Assocs., 67 B.R. [198] at 213 [(Bankr. D. Nev. 1986)].

All of Debtor's funds were swept daily.  Therefore they had
zero balances daily.  It is not possible to trace funds because
there never were any.  There is no property that could be held in
a constructive trust.  Payment to Sun Life was not made with
trust funds.  Payment to Sun Life was simply late payment on a
debt.  The Court finds that defense D) is not well taken.

**E)**   **Payments were "withheld" from employee's paychecks.**

Sun Life argues that some of the payments were withheld from
employee paychecks and therefore were not property of Debtor.  To
the extent that this argument is different from defense D, the
Court responds as follows.  Fact 113 states that in 2000 and 2001

Page  -93-

when Debtor issued checks it had no money to back up the checks, and with respect to the employee's paychecks there was no money set aside for amounts withheld.  All payments came from funds supplied by new borrowings.  Debtor may have been breaching contracts with its employees or even possibly violating some statute or rule by not segregating withholdings, but that does not transform the fact that there was 1) no money held in trust for the withholdings, 2) no money segregated or even allocated for Sun Life, or 3) no money even available at the time of payments became due, because of the nature of the zero balance accounts.  Debtor had to borrow funds from Heller to make each payment on the day the check hit the bank.  <u>See</u> fact 322, which states in part:

> Moneys deducted from employee's checks to pay insurance premiums to Defendant did not exist at the time the paycheck was cut.  There was no mechanism in place to segregate the money deducted from the employee paychecks.  Employees' deductions were subtracted from their gross pay, but the amounts deducted did not exist at the time the paycheck was cut.  On the day the employee paychecks were cut, there wasn't any money anywhere designated to cover the checks or the withholding.

**F) Estoppel by ¶¶ 7, 25 and 26 of the "Employee Benefits Motion".**

Paragraph 7 of the Motion states:

> The debtor also seeks authorization to continue postpetition the employee benefit plans and programs giving rise to the Prepetition Employee Obligations in the manner and to the extent that they were in effect immediately before the Petition Date.  As part of the foregoing relief, the Debtor seeks authorization to pay any and all local, state and federal withholding and

payroll-related or similar taxes relating to
prepetition periods, including but not limited to, all
withholding taxes, Social Security taxes and Medicare
taxes, as well as all other trust-fund type
withholdings such as garnishment contributions and
savings, pension plan, or other deductions, if any.
The term Prepetition Employee Obligations is meant to
include all such payments.

Paragraph 25 of the Motion states:

    The Debtor routinely withholds from Employee's
paychecks amounts that the Debtor is required to
transmit to third parties.  Examples of such
withholdings include Social Security, FICA, federal and
state income taxes, garnishments, health care payments,
retirement fund withholdings, savings, and charitable
donations.

Paragraph 26 of the Motion states:

    The Debtor believes that these withheld funds, to
the extent that they remain in its or it's agent's
possession, constitute monies held in trust and
therefore are not property of the Debtor's bankruptcy
estate.

Paragraph 7 requests authorization to pay any and all unpaid

local, state and federal withholding and payroll-related or

similar items relating to prepetition periods and continue to pay

them postpetition.  Debtor subsequently paid Sun Life for January

and eight days of February.  Paragraph 7 does not refer to

payments already made prepetition.  And, paragraph 7 makes no

reference to Sun Life.

    Paragraph 25 begins: "The Debtor routinely withholds from

Employee's paychecks amounts that the Debtor is required to

transmit to third parties."  The remainder of the paragraph only

itemizes examples of what it withheld.  Paragraph 25 asserts

Page  -95-

nothing else. It does not state that the amounts withheld physically existed or are or were segregated or are or were available for payment on any particular date. It merely declares that Debtor had a duty to transmit amounts withheld. Sun Life would have the Court read "withhold" as "withhold actual identifiable funds and deposit them in a segregated account." However, the definition of "withhold" carries no such connotation. <u>See</u> Webster's New Collegiate Dictionary 1355 (9th ed. 1991)("4. to deduct ... from income."); MacMillan Dictionary, <u>http://www.macmillandictionary.com</u> ("To deliberately not give something to someone."); Oxford Dictionary, <u>http://oxforddictionaries.com/</u> ("Refuse to give (something that is due to or is desired by another")). <u>Accord</u> <u>Begier</u>, 496 U.S. at 61 ("[T]here is no general requirement that the withheld funds be segregated from the employer's general funds"; this implies that sums are "withheld" whether or not segregated.) (Quoting <u>Slodov v. United States</u>, 436 U.S. 238, 243 (1978)). Paragraph 25 was a true statement: Debtor withheld amounts from payroll and had a duty to pay them to third parties.

Paragraph 26 states: "to the extent that [withheld funds] remain in its or it's agent's possession" they would be trust funds. This may be a true statement, especially if the funds could be traced. <u>Compare</u> <u>In re College Bound, Inc.</u>, 172 B.R. 399, 403 (Bankr. S.D. Fla. 1994)("<u>As long as</u> the Debtor had funds

in excess of the employee withholdings, the amounts withheld from employee wages are deemed trust funds.")(Emphasis added.)  In this case, however, Debtor had no funds at all.  Debtors' accounts had a daily zero balance.  Debtor had funds if, when and only to the extent that Heller allowed future advances on a line of credit.  No funds were traceable to amounts withheld.

Furthermore, the Court finds that judicial estoppel does not apply.  First, Plaintiff is the Chapter 7 trustee, a representative of unsecured creditors, and not in privity or bound by the Chapter 11 Debtor.  See supra at pp. 46-47.  Second, the Court does not find that the Debtor's earlier statements that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during the reorganization, payment may be authorized" actually conflicts with the Plaintiff's current statement that during the preference period, this creditor received more than other unsecured creditors and the payment should be recovered.  Id. at 48.  Similarly, the earlier statement that Debtor routinely withheld amounts does not conflict with the elements of a preference claim.  Finally, Debtor's earlier statement that the withheld funds in its possession or its agent's possession are trust funds is a legal conclusion not creating a judicial estoppel.  See, supra at p. 49.

The Court also finds collateral estoppel does not apply. The issues are simply not the same. And, neither the Chapter 7 Trustee nor Sun Life were involved in the employee benefits order motion or its resolution and had no opportunity to litigate a position. And, finally, neither equitable estoppel or promissory estoppel apply because there are no allegations that Sun Life relied on any representation or that it was reasonable in doing so. The Court specifically finds that Sun Life would not have been reasonable relying on the Employee Benefits Motion and Order as a release of preference liability because that issue is not addressed in the motion or order.

## G) Subsequent new value in the form of continuing insurance coverage (Section 547(c)(4)).

Section 547(c)(4) provides as follows:

> (c) The trustee may not avoid under this section a transfer--
> ...
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor--
>     (A) not secured by an otherwise unavoidable security interest; and
>     (B) on account of which new value the debtor did not make an otherwise unavoidable transfer[35] to or for the benefit of such creditor.

> "New value" is defined in section 547(a)(2) as:

---

[35] The section 547(c)(4) defense is considered at this point in the Memorandum Opinion only to parallel Sun Life's list of affirmative defenses as they appear in the Motion. In fact, the Court examined all the previous and remaining defenses before considering the 547(c)(4) defense to determine if any of the payments were "otherwise unavoidable."

Page -98-

"new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

Under section 547(b), a transfer is deemed to occur on the date that a check is honored. Eleva 235 B.R. at 488 (citing Barnhill v. Johnson, 503 U.S. 393, 401 (1992)). On the other hand, the majority of courts (including the Tenth Circuit Bankruptcy Appellate Panel) hold that, for section 547(c)(4), the transfer occurs when the check is delivered. Id. (Citations omitted.) Thus a creditor's provision of services[36] or goods qualifies for new value status as soon as the debtor has delivered the check that represents the preferential payment against which the new value counts.

Section 547 is generally thought to advance two bankruptcy policies. Mosier v. Ever-Fresh Food Co. (In re IRFM, Inc.), 52 F.3d 228, 232 (9th Cir. 1995) First, it achieves an equality of distribution ("Policy 1") of a debtor's assets among its

---

[36]There is really no question that a continued provision of insurance coverage constitutes new value. Official Committee of Unsecured Creditors of Maxwell Newspapers, Inc. v. Travelers Indemnity Co. (In re Maxwell Newspapers, Inc.), 192 B.R. 633, 638 (Bankr. S.D. N.Y. 1996)("[B]ecause the provision of insurance coverage was a benefit to the estate, I conclude that it constitutes 'new value' under section 547(a)(2)."); Clark v. Frank B. Hall & Company of Colorado (In re Sharoff Food Service, Inc.), 179 B.R. 669, 678(Bankr. D. Colo. 1995); In re Dick Henley, Inc., 45 B.R. 693, 699 (Bankr. D. La. 1985).

Page -99-

unsecured creditors by allowing a trustee to recover payments

made that favor any particular creditor on the eve of bankruptcy.

Id. Second, it encourages creditors to continue to do business

with financially troubled debtors with an eye toward avoiding

bankruptcy altogether ("Policy 2"). Id.; see also Charisma

Investment Co., N.V. v. Airport Systems, Inc. (In re Jet Florida

System, Inc.), 841 F.2d 1082 (11th Cir. 1988):

> [C]ourts have consistently looked to the principal
> policy objectives underlying the preference provisions
> of the Bankruptcy Code. The first objective is to
> encourage creditors to continue extending credit to
> financially troubled entities while discouraging a
> panic-stricken race to the courthouse. Another related
> objective of this section is to promote equality of
> treatment among creditors. The subsequent advance
> exception promotes these general policy objectives
> because its utility is limited to the extent to which
> the estate was enhanced by the creditor's subsequent
> advances during the preference period.

Id. at 1083-84 (citations and internal punctuation omitted).

The new value defense particularly serves Policy 2:

> First, it encourages creditors to do business with
> financially troubled debtors. A creditor will be more
> likely to continue to advance new value to a debtor if
> all these subsequent advances may be used to offset a
> prior preference.[37] If a second advance of new value
> carries no benefit, the creditor will be unlikely to
> make it. Second, this approach recognizes the fluid
> nature of ongoing commercial activity where a creditor
> looks to a debtor's entire repayment history, instead

---

[37] Strictly speaking, section 547(c) does not refer to "set
off". Rather, it says that "[t]he trustee may not avoid ... a
transfer – ... to the extent that...." Columbia Packing Co. v.
Allied Container Corp. (In re Columbia Packing Co.), 44 B.R. 613,
614 (Bankr. D. Mass. 1984). At least in this context, the effect
is the same.

of one isolated transaction, to decide whether to advance new credit.[38]

In re IRFM, Inc., 52 F.3d at 232 (citation omitted).  Section 547(c)(4) is finely tuned to protect those creditors who, after receiving a preference, in effect return some or all of the preference to the estate by providing new value to the debtor.  The relevant inquiry is whether that new value replenishes the estate.  If the debtor pays for that new value the estate is not replenished and the preference continues to unfairly benefit the creditor.  Kroh Bros. Development Co. v. Continental Construction Engineers, Inc. (In re Kroh Bros. Development Co.), 930 F.2d 648, 652 (8th Cir. 1991).

The text of section 547(c)(4), short and simple on its face, presents some difficulty.[39]  Accordingly, courts have not uniformly interpreted the statute.  One specific issue is whether in calculating the amount of the new value which the creditor will be allowed as a defense, must that new value "remain unpaid", or at least remain unpaid at the time of the petition date?  That is, in interpreting §547(c)(4)(B), does the creditor get the benefit of a subsequent unsecured advance of new value if

---

[38] These statements omit perhaps the primary motivating advantage for a supplier of goods or services to continue to do business with a struggling debtor: each continuing sale presumably generates a profit for the creditor.

[39] Or, as characterized in 5 Collier on Bankruptcy ¶547.04[4][e] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.), "the subtle and intricate wording of §547(c)(4)...."

that subsequent advance is paid for postpetition?[40]  A summary of the development of the law is as follows:

> If "new value" is paid with a transfer that is subject to avoidance (or that would be subject to avoidance but for the application of the subsequent new value exception), it still qualifies as "new value."  Earlier decisions often made reference to the purported need for subsequent new value to remain "unpaid" in order to qualify under the section 547(c)(4) exception.  With increasing consistency, more modern decisions have rejected the notion that the new value must remain "unpaid," as representing an oversimplification of the proper application of section 547(c)(4).  These later decisions have recognized that, while it is true that all unpaid subsequent new value should fall within the scope of section 547(c)(4), this does not mean that all subsequent new value upon which payment has been made necessarily falls outside the scope of section 547(c)(4).  Thus, if subsequent new value has been paid by a payment that is itself avoidable, then it should still qualify as subsequent new value for purposes of section 547(c)(4).  Moreover, if subsequent new value has been paid by a payment that would be avoidable but for the fact that the latter payment is itself unavoidable as a result of the further application of the section 547(c)(4) exception, then the original subsequent new value should be recognized as still falling within the scope of the section 547(c)(4) exception.  This construction more fully takes into account the subtle and intricate wording of section 547(c)(4).  However, to the extent that the debtor made an unavoidable transfer on account of the new value, the "new value" defense does not apply.  In this regard, section 547(c)(4) should not provide a defense to the extent that a preference transferee received "critical vendor" payments for the subsequent new value, or received administrative expense payments under section 503(b)(9) for the subsequent new value because that new value represented goods shipped during

---

[40] Or by a third party.  E.g., Kroh Bros. Development Co., 930 F.2d at 653.  In Kroh Bros., the 8th Circuit ruled that payment to the creditor by a third party rather than by the debtor did not deplete the estate and therefore did not reduce the amount of the creditor's subsequent new value defense.

Page  -102-

the twenty days immediately before the bankruptcy
filing.

5 Collier on Bankruptcy ¶547.04[4][e] (footnotes omitted).

For the purposes of the issues in this case, there are two lines of interpretation. The first one ("Line 1") can be summarized by this quote from an early bankruptcy case:

> For § 547(c)(4) to apply, three requirements must
> be met. First, the creditor must extend new value as
> defined in § 547(a)(2) as "money or ... new credit"
> after the challenged payment. The payment which is the
> subject of Count III of the Amended Complaint was made
> on September 27, 1979. Following that date, Trust
> Company made three further credit extensions to Bishop
> on October 3rd, October 4th and November 21st.
> Therefore, "new value" as defined in § 547(a)(2) was
> extended after the payment. Secondly, the new value
> must be unsecured. Section 547(c)(4)(A). The parties
> agree that the new value was unsecured. Finally, the
> new value must go unpaid. Section 547(c)(4)(B).

Pettigrew v. Trust Co. Bank (In re Bishop), 17 B.R. 180, 183

(Bankr. N.D. Ga. 1982)(Emphasis added). Note that the text of

the statute does not say "go unpaid." Other Line 1 cases that

have followed Bishop, or at least used the same language, are set

out in the margin.[41] This line of cases has generally been

---

[41]See Rovzar v. Prime Leather Finishes Co. (In re Saco Local
Development Corp.), 30 B.R. 859, 861 (Bankr. D. Me. 1983);
Keydata Corp. v. Boston Edison Co. (In re Keydata Corp.), 37 B.R.
324, 328 (Bankr. D. Mass. 1983); Erman v. Armco, Inc. (In re
Formed Tubes, Inc.), 46 B.R. 645, 646 (Bankr. E.D. Mich. 1985);
Chaitman v. Paisano Automotive Fluids, Inc. (In re Almarc Mfg.,
Inc.), 62 B.R. 684, 686 (Bankr. N.D. Ill. 1986); Armstrong v.
Marine Bank Dane County (In re Prescott), 805 F.2d 719, 728 (7th
Cir. 1986); In re Jet Florida System, Inc.), 841 F.2d at 1083;
New York City Shoes, Inc. v. Bentley International, Inc. (In re
New York City Shoes), 880 F.2d 679, 681 (3rd Cir. 1989).

Page -103-

referred to as the majority view.[42]  See, e.g., Braniff, Inc. v. Sundstrand Data Control, Inc. (In re Braniff, Inc.), 154 B.R. 773, 783 (Bankr. M.D. Fl. 1993).  In fact, the "remains unpaid" language also appears as dicta in both Tenth Circuit Bankruptcy Appellate Panel decisions and decisions of this Court.  See Eleva, 235 B.R. at 488-89; Gonzales v. DPI Food Products, Inc. (In re Furr's Supermarkets, Inc.), 296 B.R. 33, 45 (Bankr. D. N.M. 2003) (citing Eleva, Inc., 235 B.R. at 488-890.)

One branch of the Line 1 cases takes a further step by limiting the phrase "remains unpaid" to "as of the date of the bankruptcy petition."  Note that the text of the statute also does not say "as of the date of the bankruptcy petition."  See Energy Cooperative, Inc. v. Cities Service Co. (In re Energy Cooperative, Inc.), 130 B.R. 781, 789 (N.D. Ill. 1991):

> [T]he requirement that the new value remain unpaid applies only through the date of the filing of the bankruptcy petition.  "Additional post-preference unsecured credit must be unpaid in whole or in part as of the date of the petition."  Almarc, 62 B.R. at 686 (emphasis added).  See also In re New York City Shoes, Inc., 880 F.2d 679, 680 (3rd Cir. 1989) ("[T]he debtor must not have fully compensated the creditor for the "new value" to the debtor as of the date that it filed its bankruptcy petition" (emphasis added)).  Neither of the Trustee's cases cited on this matter challenge our application of the statute, as both involve repayment of the new value pre-bankruptcy.  In re Prescott, 805 F.2d 719, 722-3 (7th Cir. 1986); In re Saco Local Dev. Corp., 30 B.R. 859, 861-2 (Bkrtcy. D.C.[sic] Me. 1983).  Therefore, we will not use the post-bankruptcy

---

[42] Whether it continues to be the "majority" view is itself subject to doubt.  See 5 Colliers ¶547.04[4][e], quoted above.

transactions between Cities and ECI to limit Cities'
pre-bankruptcy new value defense.

See also Grant v. Sun Bank/North Central Florida (In re Thurman

Construction, Inc.), 189 B.R. 1004, 1014 (Bankr. M.D. Fla. 1995):

> The Eleventh Circuit has held that § 547(c)(4)
> requires that the new value remain unpaid as of the
> petition date, rather than the date the court
> adjudicates a preference action.  In re Braniff, Inc.,
> 154 B.R. 773, 784 (Bankr. M.D. Fla. 1993). See In re
> Jet Florida System, Inc., 841 F.2d 1082 (11th Cir.
> 1988).  Plaintiff contends, and the Thurman estate
> admits, that Sun Bank received payment for the new
> advance through the Thurman estate.  The transaction
> records for loan 26, however, indicate that as of the
> date of the petition, the $10,000 advance remained
> unpaid.  (Defendant Thurman Ex. 1).  Thus, the fact
> that Sun Bank received payment of the new value
> subsequent to the petition date is irrelevant to this
> discussion.  The Court finds that the value remained
> unpaid as of the petition date.

and McKloskey v. Schabel (In re Schabel), 338 B.R. 376, 381

(Bankr. E.D. Wisc. 2005)(The Seventh Circuit had ruled that new

value must remain unpaid.  Bankruptcy Court dismissed trustee's

preference action because new value was unpaid at the time of the

petition even though later paid by the debtor.); New York City

Shoes, 880 F.2d at 680 ("Third, the debtor must not have fully

compensated the creditor for the 'new value' as of the date that

it filed its bankruptcy petition.")

The second line of cases interpreting section 547(c)(4)

("Line 2") recognizes that the text of the statute does not have

a "remains unpaid" requirement.  See, e.g., Valley Candle Mfg.

<u>Co., Inc. v. Stonitsch (In re Isis Foods, Inc.)</u>, 39 B.R. 645, 653

(D. Mo. 1984):

> [Section 547(c)(4)] contains only two exceptions
> to the set off of new value advanced after a payment:
> (1) when the new value is secured by an otherwise
> unavoidable security interest; and (2) when, on account
> of the new value given, the debtor makes an otherwise
> unavoidable transfer to or for the benefit of the
> creditor. ...  The dictum in the cases relied upon by
> the appellee to the effect that the new value must be
> "unsecured" and go "unpaid" is an inaccurate and
> confusing paraphrase of the clearly stated statutory
> exceptions.

Other Line 2 cases are set out in the margin.[43]

---

[43]<u>See</u> <u>Young v. Peter J. Saker, Inc. (In re Paula Saker &
Co., Inc.)</u>, 53 B.R. 630, 634 (Bankr. S.D. N.Y. 1985); <u>Boyd v. The
Water Doctor (In re Check Reporting Services, Inc.)</u>, 140 B.R.
425, 432 (Bankr. W.D. Mich. 1992); <u>The Successor Committees of
Creditors Holding Unsecured Claims v. Bergen Brunswig Drug Co.
(In re Ladera Heights Community Hospital, Inc.)</u>, 152 B.R. 964,
968 (Bankr. C.D. Cal. 1993); <u>Wallach v. Vulcan Steam Forging (In
re D.J. Management Group)</u>, 161 B.R. 5, 6 (Bankr. W.D. N.Y. 1993);
<u>Pay 'N Pack Stores, Inc. v. Slide-Co. (In re PNP Holdings Corp.)</u>,
167 B.R. 619, 622 (Bankr. W.D. Wash. 1994); <u>Mosier v. Ever-Fresh
Food Co. (In re IRFM, Inc.)</u>, 52 F.3d 228, 232 (9th Cir. 1995);
<u>MRM Holding Corp. v. C & C Consultants, Inc. (In re MMR Holding
Corp.)</u>, 203 B.R. 605, 608 (Bankr. M.D. La. 1996); <u>Roberds, Inc.
v. Broyhill Furniture (In re Roberds, Inc.)</u>, 315 B.R. 443, 471
(Bankr. S.D. Ohio 2004); <u>Gonzales v. Nabisco Division of Kraft
Foods, Inc. (In re Furr's Supermarkets, Inc.)</u> 317 B.R. 423, 429
(10th Cir. BAP 2004); <u>Hall v. Chrysler Credit Corp. (In re JKJ
Chevrolet, Inc.)</u>, 412 F.3d 545, 552 (4th Cir. 2005);
<u>Intercontinental Polymers, Inc. v. Equistar Chemicals, LP (In re
Intercontinental Polymers, Inc.)</u>, 359 B.R. 868, 880 (Bankr. E.D.
Tenn. 2005); <u>Kaye v. Tecumseh Power Co. (In re Murray, Inc.)</u>,
2007 WL 5582730 at *2 (Bankr. M.D. Tenn. 2007); <u>Wahoski v.
American & Efrid, Inc. (In re Pillowtex Corp.)</u>, 416 B.R. 123, 130
(Bankr. D. Del. 2009); <u>TI Acquisition, LLC v. Southern Polymer,
Inc. (In re TI Acquisition, LLC)</u>, 429 B.R. 377, 385 (Bankr. N.D.
Ga. 2010); <u>Circuit City Stores, Inc. v. Mitsubishi Digital
Electronics America, Inc. (In re Circuit City Stores, Inc.)</u>, 2010
WL 4956022 at *7 (Bankr. E.D. Va. 2010).

Most Line 2 cases that examine the issue reduce further the amount the creditor can claim as a credit (against the amount it must repay the estate) pursuant to the section 547(c)(4) defense by considering the effect of postpetition payments received by the creditor. The reason usually stated is that the statute itself has no time limitation on the date of the repayment. See JKJ Chevrolet, 412 F.3d at 552-53 ("[S]ome of the challenged transfers occurred after JKJ CP filed for bankruptcy and these transfers may in fact be 'otherwise avoidable.'") See also TI Acquisition, 429 B.R. at 385 ("[T]he defense of § 547(c)(4) does not limit itself to the pre-petition period."); Moglia v. American Psychological Assn. (In re Login Bros. Book Co.), 294 B.R. 297, 300 (Bankr. N.D. Ill. 2003)("[B]oth the plain language and policy behind the statute indicate that the timing of a repayment of new value is irrelevant."); MMR Holding, 203 B.R. at 209:

> An unavoidable post-petition transfer on account of new value extended subsequent to a preference should limit the use of § 547(c)(4) by the amount of the unavoidable transfer, as without a reduction in the new value offset, the transferee would be receiving double use of the new value (once as consideration for the unavoidable transfer which effects a dollar-for-dollar reduction, and once as an offset to the prior preference which would also reflect a dollar-for-dollar reduction). There is no requirement within § 547(c)(4) which limits the universe of facts to be considered to those arising prepetition.

and D. J. Management, 161 B.R. at 8 (Holding that section 549 is relevant to a section 547(c)(4) defense.) See also Friedee

Goldman Halter, Inc. v. Aircomfort, Inc. (In re The Consolidated FGH Liquidating Trust), 392 B.R. 648, 655 n.11 (Bankr. S.D. Miss. 2008):

> The Trust also argues that the fact that Aircomfort received payment after the petition date does not alter that payment was received and that Aircomfort was compensated for the new value it asserts as a defense against the preferential payments. See, Wallach v. Vulcan Steam Forging (In re D.J. Management Group), 161 B.R. 5 (Bankr. W.D. N.Y. 1993); MMR Holding Corp. v. C & C Consultants, Inc. (In re MMR Holding Corp.), 203 B.R. 605 (Bankr. M.D. La. 1996)(an unavoidable postpetition transfer on account of new value extended subsequent to a preference should limit the use of § 547(c)(4) by the amount of the unavoidable transfer.)

This view is not unanimous in Line 2 cases. See Phoenix Restaurant Group, Inc. v. Ajilon Professional Staffing LLC (In re Phoenix Restaurant Group, Inc.), 317 B.R. 491, 496-97 (Bankr. M.D. Tenn. 2004):

> Similarly, § 547(c)(4)(B) focuses on actions of the debtor "on account of which new value the debtor did not make an otherwise unavoidable transfer ...." Throughout § 547, "the debtor" refers to the prepetition entity that transferred property or engaged in business with the preference defendant. Had Congress intended § 547(c)(4)(B) to account for payments made post petition, the section would have included something like "an otherwise unavoidable transfer of an interest of the estate in property to or for the benefit of such creditor." Instead, Congress disqualified only new value paid for by "the debtor" with an otherwise unavoidable transfer. 11 U.S.C. § 547(c)(4)(B).

See also Commissary Operations, Inc. v. Dot Foods, Inc. (In re Commissary Operations, Inc.), 421 B.R. 873, 878 (Bankr. M.D. Tenn. 2010), in which a different judge from the Middle District

of Tennessee Bankruptcy Court ruled that section 503(b)(9)[44]

claims were "analagous" to critical vendor claims.

> The possibility that a § 503(b)(9) claimant might
> receive payment for the deliveries it made to a debtor
> within the 20 days prior to the petition date does not
> remove those deliveries from the definition of "new
> value" in 11 U.S.C. § 547(a)(2). As discussed in
> Phoenix Rest. Group, Inc. v. Proficient Food Co. (In re
> Phoenix Rest. Group, Inc.), the "preference window of §
> 547 closed on the date of the filing of the bankruptcy
> petition and post-petition payments could not be used
> to deplete pre-petition 'new value.' " 373 B.R. 541,
> 547. Thus, the possibility that a debtor may pay a
> creditor's § 503(b)(9) claim post-petition does not
> negate the value represented by the claim that the
> creditor provided to the debtor. The deliveries
> benefit the estate, for purposes of 11 U.S.C. §§
> 547(a)(2) and 547(c)(4), regardless of whether the §
> 503(b)(9) claimants are paid at a later date for those
> deliveries. Even if the creditor receives a limited
> post-petition payment on its § 503(b)(9) claim to cover
> the "value" of the goods, the debtor-in-possession has
> realized the mark-up profit on the re-sale of the goods
> (or use of the goods incorporated into a finished
> product for sale, for a manufacturing or distributor
> debtor) and has the ability to fill an order to its
> customers' satisfaction. Meeting and fulfilling the
> expectation of customers achieves the most important
> goal of a business entity—to maximize its goodwill.

Id. at 878-79. But see Friedman's Inc. v. Roth Staffing

Companies, L.P. (In re Friedman's Inc.), 2011 WL 5975283 at *4

(Bankr. D. Del. 2011)(Court states its "serious doubts" about the

---

[44]That section provides:
After notice and a hearing, there shall be allowed
administrative expenses, other than claims allowed
under section 502(f) of this title, including– ...
(9) the value of any goods received by the debtor
within 20 days before the date of commencement of a
case under this title in which the goods have been sold
to the debtor in the ordinary course of such debtor's
business.

dual entity theory but decided that it need not address[45] the issue because of the Third Circuit's <u>New York City Shoes</u>' requirement that the new value had to be determined as of the date of the petition.)

The Tenth Circuit Bankruptcy Appellate Panel has not stated that "remains unpaid" is an element of the defense. <u>Gonzales v. Nabisco</u>, 317 B.R. at 429. But there is no specific Tenth Circuit guidance on whether postpetition payments should be considered in the analysis.

To analyze this issue, this Court constructed a series of six hypotheticals that examine the various interpretations of section 547(c)(4) in light of the overall return to general unsecured creditors with its emphasis on treating creditors equally. They include analysis of a simple preference recovery (Hypothetical 1) through analyses of the different treatments afforded to post-petition payments. (Hypotheticals 5 and 6). The detailed calculations are attached to this Memorandum Opinion as Exhibit A.

---

[45]Friedman's argued that "debtor" was defined in the code as a person concerning which a bankruptcy case was filed, which means that there is no debtor until a case is filed. Therefore, a debtor cannot be a prepetition entity so the use of the word debtor in section 547 cannot be a limiting factor in the preference calculation. The Court rejected this argument and found that the "debtor" was a corporate entity that existed both pre-petition and postpetition.

For all hypotheticals, assume Creditor C delivered $100,000 of goods to Debtor D before the preference period. During the preference period D paid C the $100,000. D now has a zero balance with C. Assume that the payment meets the definition of a preference. D files a Chapter 11 petition. On the petition date there are no secured debts and D's sole asset is $500,000 in cash (or less, if D makes the payments specified in the different examples). There are $75,000 of priority claims. There are $1,000,000 in unsecured debts to creditors other than C. Also assume that the estate has no administrative claims.[46]

In Hypothetical 1, there are no other transactions between C and D pre- or post-petition. D recovers the preference. The estate will have $600,000 to distribute (the $500,000 cash plus the preference recovery of $100,000). After priority claims, $525,000 is available for $1,100,000 of unsecured claims (the $1,000,000 plus C's reinstated claim under 502(h) of $100,000). There is a 47.727% dividend to general unsecured creditors. From C's perspective, it advanced a total of $100,000 in credit. After repaying the $100,000 as a preference it receives a dividend of $47,727, placing it in the same position as if it had never been paid. All unsecured creditors are treated equally.

Hypothetical 2 is identical to number 1, except that after

---

[46] The hypotheticals also ignore any transaction costs that would be incurred by the creditor, including of course attorney fees and costs.

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 111 of 138

receipt of the $100,000 C extends $40,000 of new credit in the form of goods.[47]  There are no other transactions between C and D pre- or post-petition.  When D files its bankruptcy C has a balance due of $40,000 for which it files a proof of claim.  When D attempts to collect the $100,000 as a preference, C can assert section 547(c)(4) as a defense to the extent of $40,000.  C returns $60,000 and then files a $60,000 section 502(h) claim for the recovered preference.  The estate will have $600,000 to distribute (the $500,000 cash plus proceeds from the $40,000 of new goods plus the preference recovery of $60,000).  After priority claims, $525,000 is available to pay $1,100,000 of unsecured claims (the other creditors' claims of $1,000,000 plus C's proof of claim for $40,000[48] plus C's reinstated claim under

_____

[47] The hypotheticals also assume that the new value that D receives continues to benefit the estate by that amount on the petition date.

[48]The Bankruptcy Code does not require C to reduce its pre-petition unsecured claim by the amount C applies to a section 547(c)(4) defense.  See Maxwell Newspapers, Inc., 192 B.R. at 640:

> According to the Committee, in order for Travelers to maintain its subsequent new value defense, it must give up its unsecured claim against the estate for the insurance coverage constituting its new value contribution, or otherwise, Travelers would be "permitted to recover twice on account of [its subsequent new value] defense." (Committee Memorandum of Law at 16).
>
> Again, the Committee is in error; Travelers does not seek to recover twice on the same claim but only to recover once on each of two separate claims.  Its subsequent new value defense serves to protect the
>
> (continued...)

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 112 of 138

502(h) of $60,000).  There is a 47.727% dividend to general
unsecured creditors.  All unsecured creditors are treated
equally.

Hypothetical 3 is the same as Hypothetical 2, except it
assumes that D did not pay C the $100,000 and instead of
advancing the $40,000 of new goods on credit C insisted on a
C.O.D. payment.  In this case the estate would have $600,000 in
cash (consisting of the original $500,000, plus the $100,000 it
did not pay to C less the $40,000 C.O.D. payment, plus $40,000
from the proceeds from the new goods purchased on C.O.D.).  C
files a proof of claim for the $100,000 it was not paid.  There
is no preference recovery.  After priority claims, $525,000 is
available to pay $1,100,000 of unsecured claims (the other

---

[48](...continued)
payment it received within the preference period on
account of antecedent debt.  Thus, Travelers can have
no claim against the Debtor for that antecedent debt.
However, because Travelers will have to disgorge the
preferential Second Quarter Payment, it will now be
uncompensated for the second quarter insurance coverage
it provided to the Debtor.  Pursuant to section 502(h)
of the Code, once Travelers disgorges the preference,
it will have an unsecured claim for the value of that
insurance coverage, for which it may recover in
accordance with the terms laid out in the Debtor's
confirmed plan of reorganization.
(Citations omitted); Columbia Packing Co., 44 B.R. at 615 ("The
claims of the creditors are not to be diminished by more than any
payments they are allowed to retain and for which they have not
already given credit."  See also Vern Countryman, The Concept of
a Voidable Preference in Bankruptcy, 38 Vand. L.Rev. 713, 790
(1985) ("Countryman") (citing Columbia Packing as the correct
analysis.)

creditors' claims of $1,000,000 plus C's proof of claim for $100,000). There is a 47.727% dividend to general unsecured creditors. All unsecured creditors are treated equally.

Because the results of Hypothetical 2 and 3 are identical, the effect of section 547(c)(4) treatment is to lock C into its claim as an unsecured creditor that will receive equal treatment with other unsecured creditors for its claim as of the date it receives the first preferential payment, but then treats C as if it were a C.O.D. creditor that gets paid 100% of any value it advances during the preference period (up to the amount of the preference it received). See Countryman, 38 Vand. L.Rev. at 788 n. 380. This encourages a creditor to continue to deal with a debtor approaching bankruptcy because the creditor suffers no additional harm from continuing to do business with the debtor (and in fact might result in a debtor avoiding bankruptcy altogether). See Bogdanov v. Avnet, Inc. (In re Amherst Technologies, LLC), 2011 WL 4625698 at *7 (D. N.H. 2011) (Unpublished):

> [The] critical values underlying the [section 547(c)(4)] defense ... [are]: (1) providing foundering debtors an opportunity to work their way back to solvency that they otherwise would not have, by encouraging continued extension of risky credit, see In re Pillowtex Corp., 416 B.R. at 130–31, and (2) "treat[ing] fairly" those creditors who continue to extend credit to the debtor, by preventing an "increas[e] [in their] bankruptcy loss." Id. (quotation omitted).

Hypothetical 4 is identical to number 2, except that after C's extension of $40,000 of new credit, D makes a $25,000 payment to C that qualifies as an ordinary course of business payment and is therefore not avoidable. C's $40,000 section 547(c)(4) defense from Hypothetical 2 is reduced by the later $25,000 payment because D <u>did</u> make an "otherwise unavoidable transfer,[49]" allowing D to recover $85,000 as a preference for which C has a section 502(h) claim upon returning that amount to D. The estate will have $600,000 to distribute (the $500,000 plus proceeds of the new goods of $40,000, less the $25,000 ordinary course of business payment, plus the preference recovery of $85,000). C is owed $15,000 at the petition date for which it files a proof of claim. C also has an $85,000 502(h) claim. After priority claims, $525,000 is available for $1,100,000 of unsecured creditors (the $1,000,000 plus C's proof of claim for $15,000 plus C's 502(h) claim under of $85,000). There is a 47.727%

---

[49]Section 547(c) starts: "The trustee may <u>not</u> avoid under this section [<u>i.e.</u> 547] ... " So, subsection c sets out the requirements that a creditor must satisfy to provide a defense to the trustee's preference action.

In other words, D cannot avoid the transfer to C to the extent that, after the transfer C provided new value to D that is a) not secured by an unavoidable security interest <u>and</u> b) that because of that new value D did <u>not</u> make an otherwise unavoidable transfer to C. Since D did make the $25,000 "otherwise unavoidable transfer" (unavoidable due to the ordinary course defense) the requirements of section 547(c)(4)(B) are not satisfied, so the defense fails to the extent of that otherwise unavoidable transfer.

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 115 of 138

dividend to general unsecured creditors.  All unsecured creditors are treated equally.

Hypothetical 5 is the same as Hypothetical 4, except that instead of D paying the $25,000 to C, it files Chapter 11[50] and, as part of a first day motion, D obtains permission to pay "critical vendors".  The Court's order authorizes D to pay critical vendors, but also provides that any such payment is not required and that any payment so made is not deemed to be an assumption or rejection of any contract or lease.  D then makes the $25,000 payment to C under the order, without C having provided any additional goods, on credit or otherwise.  This payment is authorized by section 549.

Assume also that the bankruptcy is filed in a jurisdiction that holds that postpetition activity is not relevant to section 547(c)(4) defenses.  So, basically Hypothetical 5 is the same as Hypothetical 4 except for the timing of the $25,000 payment. But, when D sues C to recover a preference, C's section 547(c)(4) defense is for the $40,000 unpaid as of the date of the petition. In consequence D recovers $60,000 for which C has a 502(h) claim.

In hypothetical 5, the estate has only $575,000 to distribute (the $500,000 cash less the $25,000 critical vendor payment plus $40,000 from the proceeds of the new goods and the

---

[50]D of course has waited at least 21 days to file so as to not trigger a section 503(b)(9) administrative claim.

$60,000 preference recovery.)  After priority claims, there is a net of $500,000 for $1,075,000 of unsecured creditors (the $1,000,000 of other claims plus C's proof of claim for $15,000 (the $40,000 of new goods less the $25,000 it received as a critical vendor[51]) and C's 502(h) claim of $60,000).  There is a 46.511% dividend to general unsecured creditors.  This is a reduction of 1.216% that is attributable directly to D's inability to recover $25,000 of the preference because the postpetition payment to C is deemed irrelevant.

Hypothetical 6 is the same as Hypothetical 5, except that the bankruptcy is filed in a jurisdiction that holds that postpetition events are relevant to section 547(c)(4) defenses. Therefore, when D sues C to avoid the $100,000 preference, C's section 547(c)(4) defense is limited to the $40,000 of new goods less the $25,000 postpetition critical vendor payment.  C must return $85,000 to D.  C files a proof of claim for $15,000 and has a 502(h) claim for $85,000.

In Hypothetical 6, the estate has $600,000 to distribute (the $500,000 less the $25,000 critical vendor payment, plus

---

[51]<u>Morris v. Vulcan Chemical Credit Union (In re Rubia)</u>, 257 B.R. 324, 327 (10th Cir. BAP)("Of course, VCCU is required to reduce its unsecured claim against the estate to reflect any reduction of its debt, including any reduction resulting from the debtor's Postpetition Payments."), <u>aff'd.</u>, 23 Fed.Appx. 968 (10th Cir. 2001) (unpublished).  <u>Vulcan Chemical</u> was not a section 547 case.  However, the Court reads it as a simple, somewhat obvious statement that a creditor cannot collect more than it owes from a debtor.

$40,000 in proceeds from the new goods, plus the $85,000 preference recovery.) After priority claims, there is a net of $525,000 for $1,100,000 of unsecured claims (the $1,000,000 plus C's proof of claim of $15,000 ($40,000 less the critical vendor payment of $25,000) plus C's $85,000 502(h) claim.) There is a 47.727% dividend to general unsecured creditors. All unsecured creditors are treated equally.

From the discussion above, the Court finds that the most reasonable interpretation of section 547(c)(4) is the one set out in Hypothetical 6. It results in absolutely equal treatment of all unsecured claims. Accord 5 Collier on Bankruptcy ¶ 547.04[4][e] at 547-68 ("[S]ection 547(c)(4) should not provide a defense to the extent that a preference transferee received 'critical vendor' payments for the subsequent new value, or received administrative expense payments under section 503(b)(9).")

If a court uses the dual identity approach that determines preference liability without regard to postpetition events the unsecured creditors are harmed by postpetition payments of unsecured debt. Whether the debtor becomes a different debtor-in-possession or not, the estate does not change. The estate is defined in section 541 as including all legal or equitable interests of the debtor in property as of the commencement of the case and any interest in property that the trustee recovers under

Page -118-

certain bankruptcy code provisions (including preferences).  A postpetition payment depletes the return to unsecured creditors the same as if it were made pre-petition and not recovered as a preference.  Cutting off the preference calculation at the filing of a case makes no economic sense.

During the preference period Debtor paid Sun Life the following (fact 302):

| Amounts | Payment due dates | Check Dates | Date Received |
|---|---|---|---|
| $44,850.65 | 9/1/00 | 11/7/00 | 11/13/00 |
| $44,570.16 | 10/1/00 | 12/1/00 | 12/11/00 |
| $90,447.43 | 11/1/00 & 12/1/00 | 01/5/01 | 01/16/01 |

Sun Life's Amended Statement of Material Facts (doc 92) facts 43 to 45 (which would have been 143 to 145 above) sought to fix the value of insurance benefits following each of the above payments.  Fact 43 claims that the value from receipt of the November 7 check to the receipt of the December 1 check was $25,829.92.  Fact 44 claims that the value from receipt of the December 1 check to the receipt of the January 5 check was $34,344.06.  Fact 45 claims that the value from receipt of the January 5 check to the date of the petition was $24,526.80.  These figures, and their calculation, appear on Exhibit B of Sun Life's Amended Statement of Material Facts.  Doc 92.  In the calculations Sun Life lists the dates the checks were issued and received and their amounts.  However, it then deducts from the amount of the check the dollar amount withheld from the employees

Page -119-

to calculate Debtor's share of the payment.  Sun Life then bases
the remaining calculations on this net amount.

The Court disagrees with the theory underlying this method.
It necessarily assumes that only the employer's share is subject
to being a preference.  This might be correct if the employer
funded the withholdings, segregated them and Sun Life could trace
them directly to each payment.  But, as discussed above,
withholdings were in reality just other debts and the entire
premium payments were from new borrowings which constituted
Debtor's property.  The Court's calculations of new value are
based on the gross payments.

The value of anything Sun Life provided after the petition
was filed does not count as "new value" for purposes of section
547(c)(4).  Bergquist v. Anderson-Greenwood Aviation Corp. (In re
Bellanca Aircraft Corp.), 850 F.2d 1275, 1284 (8th Cir.
1988)(Postpetition advances are given to the estate, not to or
for the benefit of the debtor.)  See also Brown v. Kitchenmaster
(In re Hertzler Halstead Hospital), 334 B.R. 276, 291 n.58
(Bankr. D. Kansas 2005)(Same, and citing cases.)  Sun Life
agrees.[52]  See Sun Life Memo, doc 52 at 25-26 (citing Field v.
Maryland Motor Truck Assoc. Workers Compensation Self-Insurance
Group (In re George Transfer, Inc.), 259 B.R. 89, 96 (Bankr. D.

---

[52] To be sure, Sun Life also asserts that the postpetition
payments it received should not reduce the amount of its
subsequent new value credit.

Page -120-

Md. 2001)(Unfortunately for the defendant, its refund to the debtors does not qualify under Section 547(c)(4) as "new value" because it was made postpetition.)) and Chiasson v. Strachan Shipping Co. (In re Massan Shipping Industries, Inc.),272 B.R. 625, 632 (E.D. La. 2001).

Given the Court's analysis of applying post petition payments to reduce the amount of Sun Life's new value defense, it may seem counterintuitive, or simply arbitrary and capricious, or both, not to credit Sun Life with those payments to the estate to increase its subsequent new value defense.  The reasons usually given for the differing treatment are three-fold.  First, there are protections for postpetition transfers to the estate.  E.g., Dick Henley, 45 B.R. at 699 and n.8 (postpetition insurance coverage that goes unpaid results in a priority administrative claim rather than addition to the amount of a section 547(c)(4) credit).  See also Sharoff Food Services, 179 B.R. at 678 (trustee was also pursuing a postpetition turnover claim against creditor, and creditor should be protected against double dipping by trustee).

In this instance, Sun Life had an administrative claim for providing postpetition insurance coverage (or would have, had it not been paid), and in fact Sun Life was paid for providing that insurance coverage.

Second, some courts reason that the purpose of section 547(c)(4) is to encourage creditors to deal with the prepetition debtor, <u>Wolinsky v. Central Vermont Teachers Credit Union (In re Ford)</u>, 98 B.R. 669, 682-84 (D. Vt. 1989), and that section does not focus on the harm to the creditor.  <u>Id.</u>  See also <u>Sharoff Food Services</u>, 179 B.R. at 678.  Whether the statute does not focus on harm to the creditor is perhaps questionable, since the encouragement to deal with the creditor prepetition does seem to take the creditor's interests into account.

Third, allowing such a credit might also put part of the case out of the control of the debtor, the creditors and the Court.  <u>Id.</u>[53]

> As for PSE & G's claim that it is entitled to an offset in the amount of the value of services provided post-petition, that claim is hereby rejected. Post-petition advances of new value may not be applied to offset preferential transfers.  To allow a creditor to offset post-petition advances against preferential transfers would be contrary to other provisions of the Code dealing with post-petition advances, would possibly prejudice the interests of other creditors, and would "ignore the orderly mechanisms established by Congress to protect all interested parties concerned."

---

[53] An example of such a result, albeit in another context, is <u>Ashland Petroleum Co. v. Appel (In re B & L Oil Company)</u>, 782 F.2d 155 (10th Cir. 1986), in which the creditor, finding itself owed a considerable sum for unpaid oil deliveries on the date of the petition, purchased large quantities of oil postpetition and then successfully asserted the doctrine of recoupment to avoid paying for its postpetition purchases, thereby netting out its prepetition claim.

Kellman v. P.S.E.&G. (In re Jolly "N", Inc.), 122 B.R. 897, 909-10 (Bankr. D. N.J. 1991) (citations omitted).

This Court need not rule on these rationales (at least the latter two), however, since as noted Sun Life was paid for its postpetition services to the estate.

The Court will now calculate Sun Life's new value defense. At the start of the preference period, November 10, 2000, Debtor owed Sun Life the premiums for September 1, 2000 ($44,850.65), October 1, 2000 ($44,570.16) and November 1, 2000 ($45,338.75) for a total of $134,759.56.

There is no evidence nor is there an allegation that the insurance contract between the Debtor and Sun Life was anything other than an arms length transaction. This suggests that each party valued the services to be provided as equal to the amount of the premiums to be paid. See Webster v. Harris Corp. (In re NETtel Corp., Inc.), 319 B.R. 290, 295 (Bankr. D. D.C. 2004) ("Presumptively, the increase in value to the estate arising from a subsequent performance of services will be measured by the contract price of the services.")(Citing In re Jones Truck Lines Inc., 130 F.3d 323, 328 n.4 (8th Cir. 1997) and In re Molten Metal Technology, Inc., 262 B.R. 172, 176 (Bankr. D. Mass.

2001)).  The Court therefore computes the values of the services as follows:

| Month | Premium | Days in Month | Per Diem |
|---|---|---|---|
| November 2000 | $45,338.75 | 30 | $1,511.29 |
| December 2000 | $45,108.68 | 31 | $1,455.12 |
| January 2001 | $46,763.01 | 31 | $1,508.48 |
| February 2001 | $46,703.78 | 28 | $1,667.99 |

The Court further finds that each individual payment Debtor made to Sun Life during the preference period was a preference. For example, the November 13, 2000 payment was for an antecedent debt (the September 2000 premium).  It was not a contemporaneous exchange.  It was late.  It was not an ordinary course of business payment.  This is true also for the December 11, 2000 payment (for October) and the January 16, 2001 payment (for November and December).  Therefore, each of the payments are avoidable by the Trustee under section 547(b).  The postpetition critical vendor payment is unavoidable by the Trustee because it was authorized under section 549.

In Exhibit B attached hereto, the Court performs the section 547(c)(4) calculations.  It starts on November 13, 2000, by noting the first preferential payment of $44,850.65.  It then deducts the value of new services provided from November 13, 2000 to December 11, 2000 when the next payment is received, leaving a running preference balance of $3,152.40.  It then adds the next preferential payment of $44,570.16 to bring the running balance

Page -124-

to $47,722,56.  After December 11, 2000 Sun Life provided new value of $53,238.08 before the next payment on January 16, 2001. Of that amount, however, only $47,722.56 can be applied to previous payments and the benefit of $5,515.52 is lost.[54]  The running balance is therefore zero.  On January 16, 2001 Sun Life received $90,447.43 in payments.  After January 16, 2001 Sun Life provided new value of $35,971.12 through the petition date of February 8, 2001.  This new value would reduce the running balance to $54,476.31.  But, the critical vendor payment made on March 5, 2001 paid back the value of the services from 1/1 to 1/16 ($24,135.68) and from 1/17 to 1/31 ($22,627.20[55]) and from 2/1 to 2/8 ($13,343.92).  These critical vendor payments are not otherwise avoidable, so may not be used to offset the new value against the preference.  The earlier new value, for November 14, 2000 through December 31, 2000 is allowed as a credit because the payments for those periods were avoidable as preferences.  The end result is that Sun Life has received a preference in the amount of $114,583.24 that the Trustee may recover.

---

[54]Any excess of new value over prior preferential payments cannot be carried forward to offset future preferential payments. It is a "subsequent new value" defense, not "subsequent new payment" defense.

[55]In other words, all of the January payment of $46,763.01. This figure differs from the sum of the 1/1 to 1/16 payment and the 1/17 to 1/31 payment by $0.13 due to rounding.

Case 03-01072-s   Doc 130   Filed 12/20/12   Entered 12/20/12 11:02:39 Page 125 of 138

As a reconciliation of this number, one can analyze the overall picture.  As of the start of the preference period Debtor owed Sun Life $134,759.56 (consisting of $44,850.65 for September 2000; $44,570.10 for October 2000; and $45,338.75 for November 2000).  To date the Trustee expects this bankruptcy will not pay a dividend to non-priority unsecured creditors.  Therefore, to receive equal treatment with all other unsecured creditors Sun Life should receive nothing for that $134,759.56[56] owed at the start of the preference period.

Sun Life was then owed $45,108.68 for the December 2000 payment, $46,763.01 for the January 2001 payment and $13,343.93 for the first 8 days of February 2001 (total, $105,215.62).  Therefore, if no payments had been made from November 10 to the petition, Sun Life would have been owed $239,975.18.

But, Sun Life received $179,868.24 during the preference period and received $60,106.93 on March 5, 2001 as a critical vendor payment.  The total receipts, $239,975.18, equal the total amount that would have been due on the petition date if no payments had been made in the preference period.  In other words, Sun Life was paid in full, unlike other prepetition unsecured creditors; this suggests that a preference recovery is due.

_____

[56]If it turns out there will be a dividend, creditors would be notified and Sun Life can file a proof of claim for amounts repaid as a preference.  That claim would then receive the same percentage dividend as other unsecured creditors.

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 126 of 138

The subsequent new value defense treats a creditor as being paid C.O.D. on subsequent new value during the preference period up to the amount of the preference balance. Therefore, we allow Sun Life credit against its preference for the new value of services for November 14 to 30, 2000 ($25,691.93), December 2000 ($45,108.68), January 2001 ($46,763.01) and February 1 to 8, 2001 ($13,343.93) in the total amount of $130,907.55. But, we must subtract the $5,515.52 that Sun Life lost by advancing new value in excess of the running preference balance. See fn. 54. Therefore, Sun Life should be allowed a new value defense of $125,392.03.

When Sun Life pays the $114,583.24 preference, it will have ended up with a net prepetition receipt of $65,285.00 (total $179,868.24 received less $114,583.24 repaid). Its postpetition receipts of $46,763.01 for the January 2001 premium and $13,343.92 for the first eight days of February 2001 premium are not avoidable. Sun Life therefore ends up with a total of $125,391.93[57].

**H)  New value (contemporaneous exchange) in the form of continued services of the Furr's employees themselves (Section 547(c)(1)).**

Bankruptcy Code section 547(c)(1) provides:

(c) The trustee may not avoid under this section a transfer--

---

[57]The difference of $0.10 in the previous paragraph is due to rounding.

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 127 of 138

(1) to the extent that such transfer was--
(A) intended by the debtor and the creditor to or for
whose benefit such transfer was made to be a
contemporaneous exchange for new value given to the
debtor; and
(B) in fact a substantially contemporaneous exchange.

In <u>Official Unsecured Creditors Committee v. Airport
Aviation Services, Inc. (In re Arrow Air, Inc.)</u>, 940 F.2d 1463,
1465-66 (11th Cir. 1991) the Eleventh Circuit discussed the
application of section 547(c)(1):

> The contemporaneous-exchange-for-new-value
> exception is an affirmative defense; so a transferee
> seeking to rely on it has the burden of establishing
> all required elements. <u>See</u> <u>Jet Florida, Inc. v.
> American Airlines, Inc. (In re Jet Florida Systems,
> Inc.)</u>, 861 F.2d 1555, 1558 (11th Cir. 1988).  And, as
> the name of the exception suggests, it has three basic
> requirements: (1) the transferee must have extended new
> value to the debtor in exchange for the payment or
> transfer, (2) the exchange of payment for new value
> must have been intended by the debtor and transferee to
> be contemporaneous, and (3) the exchange must have been
> in fact substantially contemporaneous.  <u>See, e.g.</u>,
> <u>Tyler v. Swiss Am. Secs., Inc. (In re Lewellyn & Co.,
> Inc.)</u>, 929 F.2d 424 (8th Cir. 1991); 11 U.S.C.A. §
> 547(c)(1).

The checks that Plaintiff claims are preferential are as
follows (fact 302):

| Due date | Coverage period | Amount | Check date | Date received |
|---|---|---|---|---|
| 09/01/00 | 9/2000 | $44,850.65 | 11/07/2000 | 11/13/2000 |
| 10/01/00 | 10/2000 | $44,570.16 | 12/01/2000 | 12/11/2000 |
| 11/01/00 | 11/2000 | $45,338.75 | 01/05/01 | 01/16/01 |
| 12/01/00 | 12/2000 | $45,108.68 | 01/05/01 | 01/16/01 |

Page -128-

Each check was dated at least two months after the services were provided by Sun Life.  The checks and services were not contemporaneous.  The checks could not have been intended as contemporaneous exchanges because Sun Life had already provided its services and Debtor was simply paying bills late.  And, in fact the exchanges were not contemporaneous.  Compare Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.), 130 F.3d 323, 327 (8th Cir. 1997):

> To illustrate, assume that an employer fails to pay an employee's salary and benefits when due.  The employee complains and threatens to resign, or his union threatens to strike.  If the employer responds by paying (or providing collateral for) the past-due salary or benefits, that transfer is not for new value.  See In re Elton Trucking, Inc., 1996 WL 261059 (Bankr. N.D. Ill. 1996); In re Burner Servs. & Combustion Controls Co., 1989 WL 126487 (Bankr. D. Minn. 1989).  If the employer also resumes paying the employee's current salary and benefits when due, and the employee keeps working, those current payments are contemporaneous exchanges for "new value," the employee's continuing services.

(Footnote omitted.)  This defense is not well taken.


I)   **Sun Life would have received these payments as Section 507(a)(4) priority claims anyway, therefore would not have received less in a hypothetical chapter 7 case.**

This defense was withdrawn.


J)   **Plaintiff should be estopped by ¶ 36 of the Employee Benefits Motion from arguing that the payments enabled Defendant to receive more than it would have received in a chapter 7 case.**

Paragraph 36 of the Benefits Motion states:

Page -129-

The payment of the Prepetition Employee
Obligations in the ordinary course of business should
neither prejudice general unsecured creditors nor
materially affect the Debtor's estates [sic] because
section 507(a)(3) and (a)(4) priority claims are
entitled to payment in full under a reorganization
plan.  See 11 U.S.C. § 1129(a)(9)(B).

This statement is a bare legal conclusion.  While it is true

that priority claims must be paid as a condition of confirmation,

see 11 U.S.C. § 1129(a)(9)(A)-(B)[58], it is also obvious that if

there is not a 100% return to creditors any priority claim must

be paid in full before any unsecured creditors are paid.

The Benefits Motion does not otherwise state or infer that

unsecured creditors will be paid in full.  It does not refer to

preferential transfers.  It does not refer to Sun Life.  It

promises nothing to anyone; all it does is seek authority to pay

a certain type of claim.  All paragraph 36 does is to state the

obvious; whether the priority claims are paid now or later,

payment should not prejudice general unsecured creditors because

the priority claims need to be paid before the non-priority

unsecured claims in all events.

As for the estoppel argument, the Debtor-in-Possession's

statement was a legal conclusion which does not estop later

claims.  Second, the fact that priority claims are paid before

---

[58]Subsection (A) requires payment in cash on the effective
date of the plan of section 503(a)(3) claims.  Subsection (B)
allows deferred payment of accepting classes of section 503(a)(4)
claims but otherwise requires payment in cash.

Page -130-

unsecured claims does not contradict the elements of a preference claim nor the allegations of the complaint against Sun Life that it was preferred to other unsecured creditors. Collateral estoppel does not apply because the issues are not the same. And, finally, there are no allegations that anyone misstated facts or that Sun Life relied on misstated facts.

The Court finds defense J not well taken.

**TRUSTEE'S CASE**

Having found that none of Sun Life's affirmative defenses are meritorious, the Court finds that Trustee has, in fact, shown that she is entitled to summary judgment.

| Element | Proof |
|---|---|
| any transfer of property of the debtor— | Borrowed funds belong to debtor. Bailey, 314 F.3d at 1199. Debtor had dominion and control over its checking account. Fact 114. Parks, 550 F.3d at 1255. |
| (1) to or for the benefit of a creditor; | Fact 142. |
| (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; | Fact 6. |
| (3) made while the debtor was insolvent; | Fact 8. |
| (4) made— (A) on or within 90 days before the date of the filing of the petition; | Fact 9. |

| | |
|---|---|
| (5) that enables such creditor to receive more than such creditor would receive if— (A) the case were a case under Chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title. | Facts 159 & 215.  See Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.), 930 F.2d 458, 465 (6th Cir. 1991)("Unless the estate is sufficient to provide a 100% distribution, any unsecured creditor (as the bank must be treated prior to confirmation of the plan) who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation.") (Citation omitted.)  See also Elliott v. Frontier Properties/ LP 102 (In re Lewis W. Shurtleff, Inc.), 778 F.2d 1416, 1421 (9th Cir. 1985)("[A]s long as the distribution in bankruptcy is less than one-hundred percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made."); Rocor Int'l, Inc., 352 B.R. at 330 (Same.) |

In sum, Plaintiff has established the preferential transfer and Sun Life has established its subsequent new value defense, in part.

**PREJUDGMENT INTEREST**

In the Tenth Circuit, if a statute does not prohibit the award of prejudgment interest, prejudgment interest may generally be awarded if: "1) the award of prejudgment interest would serve to compensate the injured party, and 2) the award of prejudgment

Page -132-

interest is otherwise equitable." <u>Turner v. Davis, Gillenwater &</u>
<u>Lynch (In re Investment Bankers, Inc.)</u>, 4 F.3d 1556, 1566 (10th
Cir. 1993), <u>cert. denied</u>, 510 U.S. 1114 (1994)(Citations
omitted.)  Bankruptcy judgments traditionally award prejudgment
interest on preference recoveries unless the amount of the
contested payment is undetermined until judgment.  <u>Id.</u> (Citations
omitted.)

This adversary proceeding was filed in 2003.  As
demonstrated by the docket, the parties engaged in extensive
discovery and stipulated to many continuances of pretrial
conferences and extensions of discovery deadlines.  Defendant
filed its Motion for Summary Judgment in December, 2005 and then
as discovery continued it filed supplemental discovery and a
revised statement of material facts in April, 2006.  Various
motions were filed to strike affidavits, which were all opposed
and briefed into 2007.  The parties repeatedly attempted to
settle.  The Plaintiff, through her attorneys, at various times
expressed an intention to file a cross motion for summary
judgment.  Then the adversary slipped off the parties' and the
Court's radars.  Finally, in 2009 the Court set a status
conference which resulted in a scheduling order (doc 119) and the
Plaintiff's Motion for Summary Judgment in November, 2009 which
came under submission on March 16, 2010.  Thereafter, the parties

submitted stipulations that included a suggested "roadmap" to the summary judgment motions.

The Court commends the parties on the high quality and originality of the arguments and the depth of details in support of their respective positions. On the other hand, the number of issues and voluminous details in support of the facts required an extensive amount of time to absorb, analyze, organize and decide. Therefore, the Court also accepts some responsibility for the delays in this case.

An award of prejudgment interest would obviously compensate the estate for the loss of use of the preferentially transferred funds. However, in this case the Court finds that the award would not be equitable to Sun Life. Sun Life's defenses were not unreasonable. Its arguments were creative, logical and based on a good faith belief that it might prevail, at least on some theories. And, Sun Life was ready to proceed when it filed its motion.

The request for prejudgment interest will be denied.

## CONCLUSION

The Court will enter an Order in conformity with this Memorandum Opinion granting Plaintiff's Motion for Summary Judgment, awarding Plaintiff a Judgment but denying Plaintiff's request for Prejudgment Interest, and denying Defendant's Motion for Summary Judgment.



Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  December 20, 2012

Copies to:

Thomas D Walker
Attorney for Plaintiff
500 Marquette Ave NW Ste 650
Albuquerque, NM 87102-5309

Victor E Carlin
Moses Law Firm
PO Box 27047
612 First Street, NW
Albuquerque, NM 87125-7047

Office of the United States Trustee
PO Box 608
Albuquerque, NM 87103-0608


Attached:
     Exhibit A: Hypothetical applications of section 547(c)(4).
     Exhibit B: Application of section 547(c)(4) to Sun Life.

**HYPOTHETICAL APPLICATIONS OF SECTION 547(c)(4)**
Exhibit A to Memorandum Opinion in Gonzales v. Sun Life Insurance Co., Adv. 03-1072.

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| **assets** | | | | | | |
| petition | $ 500,000 | $ 500,000 | $ 560,000 | $ 475,000 | $ 500,000 | $ 500,000 |
| new goods | $ 0 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 |
| crit vendor | $ 0 | $ 0 | $ 0 | $ 0 | $ (25,000) | $ (25,000) |
| § 547 | $ 100,000 | $ 60,000 | $ 0 | $ 85,000 | $ 60,000 | $ 85,000 |
| subtotal | $ 600,000 | $ 600,000 | $ 600,000 | $ 600,000 | $ 575,000 | $ 600,000 |
| priority | $ (75,000) | $ (75,000) | $ (75,000) | $ (75,000) | $ (75,000) | $ (75,000) |
| net | $ 525,000 | $ 525,000 | $ 525,000 | $ 525,000 | $ 500,000 | $ 525,000 |
| **claims** | | | | | | |
| petition | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 |
| 502(a)claim | $ 0 | $ 40,000 | $ 100,000 | $ 15,000 | $ 15,000 | $ 15,000 |
| 502(h)claim | $ 100,000 | $ 60,000 | $ 0 | $ 85,000 | $ 60,000 | $ 85,000 |
| total | $1,100,000 | $1,100,000 | $1,100,000 | $1,100,000 | $1,075,000 | $1,100,000 |
| | | | | | | |
| **% dividend** | 47.727% | 47.727% | 47.727% | 47.727% | 46.512% | 47.727% |

**APPLICATION OF SECTION 547(c)(4) TO SUN LIFE**
Exhibit B to Memorandum Opinion in Gonzales v. Sun Life Insurance Co., Adv. 03-1072

The section 547(c)(4) analysis follows:

| Date | Payment Amount | for month of | New value dates | Number of days | Per diem | New Value Amount | Increase -Deduction | Running Preference Amount |
|------|---------------|--------------|-----------------|----------------|----------|------------------|---------------------|---------------------------|
| 11/13/00 | $44,850.65 | 9/00 | | | | | $44,850.65 | $44,850.65 |
| New value after 11/13/10 | | | 11/14 to 11/30 | 17 | $1,511.29 | $25,691.93 | | |
| | | | 12/1 to 12/11 | 11 | $1,455.12 | $16,006.32 | | |
| New value reduction | | | | | | | $-41,698.25 | $3,152.40 |
| 12/11/00 | $44,570.16 | 10/00 | | | | | $44,570.16 | $47,722.56 |
| New value after 12/11/10 | | | 12/12 to 12/31 | 20 | $1,455.12 | $29,102.40 | | |
| | | | 1/1 to 1/16 | 16 | $1,508.48 | $24,135.68 | | |
| New value reduction | | | | | | | $-53,238.08 | $0.00 |
| 1/16/01 | $45,338.75 | 11/00 | | | | | $45,338.75 | $45,338.75 |
| 1/16/01 | $45,108.68 | 12/00 | | | | | $45,108.68 | $90,447.43 |
| New value after 1/16/01 | | | 1/17 to 1/31 | 15 | $1,508.48 | $22,627.20 | | |
| | | | 2/1 to 2/8 | 8 | $1,667.99 | $13,343.92 | | |

| Date | Payment Amount | for month of | New value dates | Number of days | Per diem | New Value Amount | Increase -Deduction | Running Preference Amount |
|---|---|---|---|---|---|---|---|---|
| New value reduction | | | | | | | $-35,971.12 | $54,476.31 |
| 2/8/01 | PETITION | | | | | | | |
| 3/5/01 | $46,763.01 | 1/01 | | | | | $46,763.01 | $101,239.32 |
| 3/5/01 | $46,703.78 | 2/01 | for entire month. $46,703.78 /28 *8 = | | | | $13,343.92 | $114,583.24 |

–2–

Case 03-01072-s    Doc 130    Filed 12/20/12    Entered 12/20/12 11:02:39 Page 138 of 138